Elliot HEATH, Appellant,

v.

UNITED STATES, Appellee.

No. 08–CF–347.

District of Columbia Court of Appeals.

Argued Oct. 20, 2010.
Decided July 21, 2011.

---

James Whitehead, Public Defender Service, with whom James Klein, Samia Fam, Jaclyn Frankfurt, and Alice Wang, Public Defender Service, were on the brief, for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, Mary B. McCord, Glenn L. Kirschner, and Lynn E. Haaland,

Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges, and STEADMAN, Senior Judge.

GLICKMAN, Associate Judge:

 Elliot Heath appeals his convictions for armed first-degree pre-meditated murder, armed assault with intent to kill, and associated weapons offenses. He primarily contends that the trial court unconstitutionally deprived him of a meaningful opportunity to present a complete defense when it erroneously excluded expert testimony he sought to present on the subject of eyewitness identification. The government concedes, and we agree, that the court erred in failing to conduct the inquiry our cases have held necessary to support its exclusionary ruling. Even so, considering appellant's proffer, we see no reasonable probability that the excluded expert testimony would have led the jury to have a reasonable doubt of appellant's guilt that did not otherwise exist. We therefore are persuaded that appellant's constitutional right to present a defense was not violated by the exclusion of his expert's testimony, and we conclude that the trial court's error was harmless.[1]

## I.

The charges against appellant arose from the murder of Patrick Carter on the morning of November 17, 2005, as he sat with his girlfriend, Felicia Edwards, in his parked car outside his mother's house in the 1800 block of Corcoran Street, N.E. In the moments before the shooting took place, Ms. Edwards was entering information into the calendar of her mobile phone. She happened to look up and noticed two men standing near the bus stop at the end of the street, roughly 250 to 350 feet away. When she looked up again, she saw them walking down Corcoran Street in her direction. There appeared to be nothing amiss. Ms. Edwards did not recognize either individual. She later described one of them to police as a tall, dark-complected black man with hair in dreadlocks, and the other as shorter, lighter-skinned, and bald.

Unexpectedly, the two men stopped next to the car in which Mr. Carter and Ms. Edwards were sitting. Then, without warning, the men began shooting into the vehicle. Mr. Carter was hit seven times and mortally wounded. As Ms. Edwards reached across to shield Carter and try to start the car, she too was shot, though not fatally. After the shooting, the assailants

---

1. Appellant also argues that the trial court erred in delivering, over his objection, a coercive "attitude and conduct" instruction before the jury began its deliberations. The instruction directed jurors to avoid committing to an opinion prematurely and-employing language we subsequently disapproved in *Jones v. United States*, 946 A.2d 970 (D.C.2008)-cautioned them that "the final test" of the quality of their service would be found "in the verdict you render here in the courtroom[,] and not in the preliminary opinions any of you may have before you reach your verdict." The quoted admonition is inappropriate and should be avoided because it may be understood to encourage jurors to surrender their honest convictions in order to reach agree-

ment. *See id.* at 974. Nonetheless, we must consider the trial court's instruction as a whole and in context. The instruction omitted certain other "objectionable language found in the *Jones* instruction," *see Lampkins v. United States*, 973 A.2d 171, 173 (D.C. 2009), and it included additional "language balanced against the desirability of agreement that reminded the jurors not to surrender their honestly held convictions, even if that prevented agreement." *Jones*, 946 A.2d at 974; *see also McClary v. United States*, 3 A.3d 346, 354–55 (D.C.2010). Given those factors, as well as the absence of any circumstances suggesting the jury's verdict was the result of compromise, we cannot find reversible error.

fled. Their motive for the attack is unknown.

Appellant was implicated in the shooting eight months later, when two apparently unrelated events led to his identification and arrest. The first event occurred on July 20, 2006, when a woman named Courtnee Ervin, arrested for violating bail on pending drug and prostitution charges, told detectives she had witnessed the shooting. Ms. Ervin explained that she was present in the 1800 block of Corcoran Street, getting high on crack cocaine, when the shooting erupted. She looked up and, before fleeing, got a good look at the two shooters. Ms. Ervin was positive that one of them was "L," a person she had known for some years from her frequent visits to Corcoran Street. When the detectives then showed Ms. Ervin a photograph of appellant, she confirmed that he was the "L" she knew.[2]

The second event leading to appellant's arrest occurred about a week after Ms. Ervin spoke to the police, when a tall, dark-skinned man with dreadlocks walked into the shoe store where Ms. Edwards worked as a salesperson. The man was a stranger to Ms. Edwards, but upon seeing him, she became very nervous and felt physically ill. She was so distressed that she ran into a back room and called both her parents and a police detective working on the investigation of the Corcoran Street shooting to report her sighting of the man. Two days later, on July 29, 2006, the detective showed Ms. Edwards an array of nine photographs of African–American men of approximately the same age and complexion, all with their hair in dreadlocks.[3] Included in the array was the photo of appellant that Ms. Ervin had said depicted the shooter she knew as "L." Ms. Edwards selected that same photo, saying it portrayed the man who had entered her store. At that time, she did not identify appellant as one of the men who had attacked her and Mr. Carter. However, when Ms. Edwards appeared before the grand jury a few months later, in November 2006, she had become certain that appellant was one of the assailants. In her subsequent testimony at trial, Ms. Edwards referred to him as "L," the detectives having told her his nickname.

The government's case against appellant rested heavily on the mutually reinforcing identification testimony of Ms. Edwards and Ms. Ervin, neither of whom knew or had spoken with the other. A third witness corroborated their testimony.[4] Danielle Carter, the decedent's sister, testified at trial that she was inside her mother's house on Corcoran Street when she heard

**2.** Ms. Ervin identified the second shooter, whom she also claimed to know, as a man called "Smilee."

**3.** The written instructions accompanying the photo viewing sheet shown to Ms. Edwards on July 29 read as follows:

> In a moment you will be shown a group of photographs. The group of photographs may or may not contain a photograph of the person who committed the crime you witnessed or were the victim of. It is important that you keep in mind that hairstyles, beards, and moustaches may be changed. Also, keep in mind that a person's complexion may look different in a photograph; it may be lighter or darker than shown in the photograph. Pay no attention to any markings or numbers on the photograph or any other differences in the type of [sic] style of the photograph. Please take your time and look at ALL of the photographs carefully before you say anything or select a photograph. After you have looked at all the photographs, tell me whether or not you see any person(s) that you recognize, and if so, from where do you recognize the person(s)?

**4.** The prosecution presented no forensic evidence linking appellant to the shooting, nor any evidence that he had inculpated himself or that he had a motive to commit the crime.

what sounded to her like firecrackers. She looked out the second-story window and saw a man running away from her brother's car. Not having seen the fleeing man's face, Ms. Carter said she could not identify him definitively. Nonetheless, she thought he was appellant, a person whom she had seen before on Corcoran Street "almost every day," because he had the same height, build, gait, and "shoulder-length dreads" as appellant had, and because he was wearing the same kind of dark winter coat she had seen appellant wear.[5]

In his defense, appellant denied any involvement in the shooting and claimed he had been misidentified—either mistakenly, in the cases of Ms. Edwards and Ms. Carter, or intentionally, in the case of Ms. Ervin. Appellant cross-examined Ms. Edwards extensively, focusing on her inability to see either assailant's face during the attack because her view was blocked by the roof of the car, and on her three-month delay in identifying him as one of the shooters after having observed him in her store. Ms. Edwards admitted telling the police that she "really didn't get to see" the shooter with the dreadlocks and explaining to the grand jury that she saw only "bits and pieces" of that individual. She acknowledged, moreover, that her nervous reaction when she encountered appellant in her store was not unusual, as she became upset and anxious in the months following the shooting when she saw other dark-complected men with dreadlocks. (She said her reaction to appellant was more intense, however.) Appellant probed whether Ms. Edwards's belated and sudden identification of him a year after the

shooting was influenced by the recurrent nightmares she reported having experienced in the interim, in which, she said, she had relived the traumatic event and reconstructed its details.

In cross-examining Ms. Ervin, appellant impeached her with her prior convictions and with her inconsistent statements to the police and the grand jury regarding her location during the shooting and other details. Appellant also explored the effect of Ms. Ervin's heavy cocaine use on her ability to perceive and remember the event, and her motive to curry favor with the government in order to obtain a lenient sentence in her pending criminal case. (Ms. Ervin testified pursuant to a cooperation agreement with the government.) As to Ms. Carter, appellant focused primarily on her lack of certainty and her failure to link him to the shooting, even tentatively, prior to trial. Ms. Carter admitted telling the grand jury that she did not recognize the person she saw running from the scene of the shooting and could not tell whether that person was appellant.

Although appellant did not take the stand, he called several witnesses in his defense. Sontia Lemon, appellant's wife, testified that they were at home on the morning of the shooting—they lived about eight or nine houses away on Kendall Street, which is behind, and parallel to, Corcoran Street—and that appellant ran outside to investigate when they heard the gunfire. She followed him to the scene of the shooting and saw him use his cell phone to summon the police. A second defense witness, Desmond Belt, claimed he too heard appellant telephone from the scene for help.[6] Officer Bryant Collins,

---

5. Ms. Carter also testified that shortly after the shooting, she saw a man known to her as "Smilee" (whom Ms. Ervin had named as the second shooter) in the vicinity. Ms. Carter did not know Ms. Ervin.

6. The parties stipulated that the recording of appellant's putative 911 call was unavailable due to a malfunction in the Metropolitan Police Department's master tape recorder.

one of the officers who responded to the crime scene, confirmed that he took down appellant's name there.[7] Another defense witness testified to having seen someone other than appellant running from the 1800 block of Corcoran Street after the shooting. The fleeing man appeared to have "something concealed on his right-hand side of his back." Finally, an analyst from a private testing facility testified that appellant was not the source of DNA found on cartridge casings and a piece of chewing gum recovered by the police from the vicinity of the shooting.[8]

To bolster his defense of misidentification, appellant had hoped to present the expert opinion testimony of Dr. Lori Van Wallendael, an associate professor of cognitive psychology at the University of North Carolina. Appellant's proffer described Dr. Van Wallendael's qualifications and stated she would testify "about the factors present in this case that are known to adversely affect eyewitness perception, memory, and identification ... includ[ing] stress, weapon focus, and deficient and unreliable identification procedures." The proffer stated that "[t]here is a broad consensus among the researchers in this area that (1) violence causing stress and emotional arousal at the time of an encounter negatively affects the accuracy of an eyewitness identification; and (2) the presence of a weapon at the time of the encounter leads to the phenomenon of 'weapon focus' that in turn negatively affects the accuracy of an eyewitness identification." The proffer cited studies showing that many jurors misunderstand these effects and erroneously think, for example, that the violent nature of the crime would be likely to enhance rather than diminish the reliability of an eyewitness' memory. Further, according to the proffer, research on identification procedures had identified "certain best practices including (1) cautionary instructions that the culprit may or may not be in the lineup and that the police will continue to investigate even if no identification is made; (2) admonishing the eyewitnesses not to confer about their memories or identifications to prevent cross-contamination of evidence; (3) ensuring that the identification procedure is double blind—that is, that the law enforcement officer conducting the lineup or photo array does not know the identity of the suspect and that the eyewitness attempting an identification is told that the officer does not know the identity of the suspect; [and] (4) conducting the lineup or photo array sequentially or serially."

Appellant further proffered that Dr. Van Wallendael would testify about a phenomenon called "Unconscious Transference," defined as the "transfer of one person's identity to that of another person from a different setting, time, or context." In an unconscious transference, the proffer stated, "the witness misidentifies the familiar innocent person without having a conscious recollection of the previous exposure to him/her and without awareness of the true context of the previous exposure." Appellant asserted that this phenomenon could explain how "an innocent bystander at the crime scene [could be] falsely identified as being the criminal." Appellant's theory, for which he sought Dr. Van Wallendael's expert imprimatur, was that Ms. Edwards could have seen him at the scene immediately *after* the shooting and unconsciously

---

7. Ms. Edwards testified that she did not recall seeing appellant at the scene following the shooting.

8. Appellant also was excluded as the source of latent fingerprints recovered from the decedent's car.

confused him with the shooter he resembled.

The government moved *in limine* to exclude Dr. Van Wallendael's testimony, primarily on the grounds that "all of the points that the defense seeks to establish through an expert can be addressed through cross-examination of the witnesses themselves" and would not be "beyond the ken of the average layperson or juror." The government also disputed the relevance of Dr. Van Wallendael's proposed opinion testimony because the research on which she relied concerned the reliability of identifications of strangers, whereas the identifications of appellant in this case were by persons who knew him or (in the case of Ms. Edwards) "saw him on a second sighting."

The trial court granted the government's *in limine* motion without a hearing. In a brief oral ruling, the court excluded Dr. Van Wallendael's testimony on the ground that cross-examination would suffice to present the issues and enable the jury to assess the eyewitness identifications of appellant.[9]

The trial lasted five days. The jury was out for approximately a day before it re-turned its verdict finding appellant guilty on all counts.

## II.

■■■ Appellant contends—and appellee concedes—that the trial court erred in excluding the proffered expert testimony of Dr. Van Wallendael without properly conducting the particularized inquiry required by this court's decisions in *Dyas v. United States*[10] and *Benn v. United States* (*Benn II* ).[11] In *Benn II*, we recognized that the defense "should be permitted to present expert testimony on the unreliability of eyewitness testimony in appropriate cases."[12] We held that while the issue is committed to the trial court's discretion, the court must evaluate a particular defense proffer of such testimony in "the concrete setting" of the case under each of the criteria enumerated in *Dyas*.[13] The determination of admissibility

> must be case-specific, based on the proffered expert testimony, and must consider: (1) the current state of generally-accepted scientific research; (2) whether it is within the common knowledge of lay jurors; and (3) whether the testimony would assist the jury, taking into account the relevance and probative value of the proposed scientific evidence to the

---

9. The judge stated only that "I don't believe it's necessary in this particular case to have an expert. You can cross-examine the witnesses as to what their dreams are, if that's part of this case, and let the jury determine whether they have properly observe[d] the people who they may be testifying that they did observe. So I'm going to deny your request for [Dr. Van Wallendael's testimony]."

10. 376 A.2d 827 (1977). *Dyas* set forth three criteria governing the admissibility of expert opinion testimony generally: (1) whether the subject matter of the testimony is "beyond the ken of the average layman"; (2) whether the witness is sufficiently qualified as to make it appear that her expertise will "probably aid" the trier of fact; and (3) whether the state of the pertinent art or scientific knowledge per-

mits a reasonable opinion to be asserted. *Id.* at 832. "The third criterion incorporates the so-called *Frye* test, under which scientific testimony is admissible only if the theory or methodology on which it is based has gained general acceptance in the relevant scientific community." *Jones v. United States*, 990 A.2d 970, 977 (D.C.2010) (citing *Frye v. United States*, 54 App.D.C. 46, 47, 293 F. 1013, 1014 (1923)).

11. 978 A.2d 1257 (D.C.2009). We issued our opinion in *Benn II* two years after the trial in this case.

12. *Id.* at 1270.

13. *Id.* at 1278.

eyewitness identification in the case.[14]

We cautioned in *Benn II* that while "there are certain cases where cross-examination may suffice to test the reliability of the identification made by an eyewitness ... reliance on cross-examination cannot be automatic or reflexively adopted in lieu of proffered expert testimony" because, among other reasons, "the information that an expert can provide about research studies is different in nature and cannot be elicited from a lay witness during cross-examination." [15]

As the government admits, the trial court's ruling in this case excluding Dr. Van Wallendael's proffered testimony did not satisfy *Benn II*'s procedural requirements. Appellant's proffer described Dr. Van Wallendael's credentials, stated that experts had come to a general consensus that stress, weapon focus, and certain police identification procedures can negatively impact eyewitness accuracy, and cited studies showing that jurors tend to misunderstand the effects of those factors. Further, appellant proffered that Dr. Van Wallendael would testify about research on "unconscious transference," a phenomenon (if it exists) potentially applicable to Ms. Edwards's identification of appellant and

rather plainly beyond the ken of lay jurors. The trial court did not evaluate appellant's proffer in light of the full three-part *Dyas* test, and its ruling that cross-examination of the eyewitnesses would render the expert testimony unnecessary was conclusory. It was not the product of an adequate weighing of "the efficacy of cross-examination ... in the context of the particular case ... against the value added to the jury of the proffered expert testimony." [16]

Appellant asks us to remand this case for the court to conduct the necessary inquiry into whether the proffered testimony of Dr. Van Wallendael would satisfy the criteria for admission. Such a remand would be our normal response upon finding that a trial court excluded expert testimony proffered by the defense without properly evaluating it in accordance with *Dyas* and *Benn II*.[17] However, the government argues that a remand is unnecessary in this case, because even if appellant should have been permitted to present Dr. Van Wallendael's proffered testimony to the jury, we can say with "fair assurance" that the erroneous exclusion of that testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict" and hence was harmless.[18]

14. *Id.*

15. *Id.* at 1279 (footnote omitted).

16. *Id.* at 1280. The trial judge's statement that the expert testimony was not necessary "in this particular case" evinced his recognition that such testimony on the reliability of eyewitness identification could be admitted if certain conditions were met. Thus the judge did not erroneously assume that "expert testimony questioning eyewitness identification is 'never' helpful to the jury." *Id.* at 1275. But a passing statement that the judge considered the "particular case" is insufficient to show that the judge properly performed a case-specific consideration of the three *Dyas* factors.

17. *See id.* at 1280; *see also Russell v. United States,* 17 A.3d 581 (D.C.2011).

18. The government invokes the standard of harmlessness applicable to non-constitutional error set forth in *Kotteakos v. United States,* 328 U.S. 750, 764–765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946):

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand. . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not

Appellant disagrees, and argues further that the government's burden is to show that the exclusion of Dr. Van Wallendael's testimony was harmless beyond a reasonable doubt, because it deprived him of his constitutional right to a meaningful opportunity to present his defense.[19]

In order to address the parties' respective contentions, we are obliged to answer a threshold legal question: What is the test for determining when a trial court's erroneous exclusion of defense evidence violates the defendant's constitutional right to present a defense? We conclude that the correct test incorporates a familiar materiality requirement: There is no constitutional violation unless there exists a reasonable probability that the excluded evidence would have altered the jury's verdict in the defendant's favor.

Applying that test to the putatively erroneous exclusion of Dr. Van Wallendael's proffered testimony, we conclude that the error did not amount to a constitutional violation. We find it highly probable that the trial court's ruling did not influence the jury's verdict; we see no reasonable probability that the expert's testimony would have engendered an otherwise-nonexistent reasonable doubt of appellant's guilt in the jurors' minds. Similarly, we hold that the error was harmless under the test for non-constitutional error.

## A. The Constitutional Right to Present a Defense

 The Constitution guarantees a criminal defendant a meaningful opportunity to call witnesses in order to present a complete defense.[20] The right is grounded in the Sixth Amendment's Compulsory Process Clause[21] and is a component of the due process of law required by the

---

affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.
*See also id.* at 776, 66 S.Ct. 1239 ("We think it highly probable that the error had substantial and injurious effect or influence in determining the jury's verdict."). We have said that in order to find a non-constitutional error harmless, "we must find it *'highly probable* that [that] error did not contribute to the verdict.'" *Ellis v. United States,* 941 A.2d 1042, 1048 (D.C.2008) (emphasis and brackets in the original; citation omitted).

19. Appellant invokes the standard of harmlessness set forth in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967): "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Equivalently, the Supreme Court stated, the issue is "'whether there is a *reasonable possibility* that the [constitutional error] might have contributed to the conviction.'" *Id.* (emphasis added) (quoting *Fahy v. Connecticut,* 375 U.S.

85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)).

20. *See, e.g., Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) ("[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'") (citation omitted); *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense.").

21. *Taylor v. Illinois,* 484 U.S. 400, 409, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) ("The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact."); *see also Washington v. Texas,* 388 U.S. 14, 23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) ("The Framers of the Constitution did not intend to commit the futile act of giving to a defendant the right to secure the attendance of witnesses whose testimony he had no right to use.").

Fifth and Fourteenth Amendments.[22] But though the right is fundamental, it is not unlimited. In the first place, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence,"[23] and "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."[24] Evidentiary rules excluding evidence from criminal trials violate the constitutional right to present a defense only if they "infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve."[25]

■ A trial court's *improper application* of a constitutionally valid evidentia-

ry rule to exclude relevant and competent defense evidence—the type of problem we confront in the present case—also may violate a defendant's constitutional right to present a defense.[26] "Not every" such error will do so, however.[27] Rulings excluding (or admitting) evidence ordinarily are within the ambit of the trial court's discretion and are subject to review only for abuse of that discretion under the *Kotteakos* standard of harmlessness. It is the "rare" case in which a trial court's "application of a rule of evidence is so erroneous and unfair" as to deprive a defendant of a meaningful opportunity to present a complete defense.[28] "Only when the error deprives a defendant of a fair trial does it amount to a constitutional violation."[29]

■ Thus, the Supreme Court has described the Sixth Amendment guarantee

---

**22.** *Washington*, 388 U.S. at 19, 87 S.Ct. 1920 ("This right is a fundamental element of due process of law."). The substance of the due process right to present defense witnesses is largely determined by the scope of the Sixth Amendment guarantee. *See Strickland v. Washington*, 466 U.S. 668, 684–685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment.").

**23.** *Taylor*, 484 U.S. at 410, 108 S.Ct. 646.

**24.** *Holmes v. South Carolina*, 547 U.S. 319, 326, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006).

**25.** *Id.* at 324, 126 S.Ct. 1727 (internal quotation marks and brackets omitted). *See also Rock v. Arkansas*, 483 U.S. 44, 55, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) ("Just as a State may not apply an arbitrary rule of competence to exclude a material defense witness from taking the stand, it also may not apply a rule of evidence that permits a witness to take the stand, but arbitrarily excludes material portions of his testimony."); *Washington*, 388 U.S. at 22–23, 87 S.Ct. 1920 (Constitution violated by blanket rule prohibiting alleged accomplices from testifying on behalf of de-

fendant, where the rule was irrational); *cf. United States v. Scheffer*, 523 U.S. 303, 309, 316–17, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (rejecting constitutional challenge to rule excluding lie detector results because rule was not arbitrary or disproportionate to the ends it was designed to serve).

**26.** *See United States v. Lopez–Alvarez*, 970 F.2d 583, 588 (9th Cir.1992) ("When evidence is excluded on the basis of an improper application of [a valid rule], due process concerns are still greater because the exclusion is unsupported by any legitimate state justification.").

**27.** *Clark v. United States*, 639 A.2d 76, 82 (D.C.1993).

**28.** *United States v. Mahdi*, 389 U.S.App.D.C. 374, 383, 598 F.3d 883, 892 (2010) (internal quotation marks omitted); *accord Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir.2001) ("Erroneous evidentiary rulings rarely rise to the level of harm to this fundamental constitutional right to present a meaningful defense.") (internal quotation marks omitted).

**29.** *United States v. Lathern*, 376 U.S.App.D.C. 347, 350, 488 F.3d 1043, 1046 (2007).

as "the accused's right to call witnesses whose testimony is 'material and favorable to his defense.' " [30] A materiality requirement is implicit in the right to a meaningful opportunity to present a complete defense, just as it is in other constitutional rights to obtain and utilize evidence—in particular, the Sixth Amendment right to compulsory process to secure defense witnesses and the due process right to the disclosure by the prosecution of exculpatory evidence in its possession.[31] "At a minimum," this means "a defendant must demonstrate that the excluded evidence was important to his defense" in order to show that the error was of constitutional magnitude.[32] The materiality inquiry therefore focuses on prejudice with respect to the fairness of the trial as a whole.[33] Our

**30.** *Rock*, 483 U.S. at 52, 107 S.Ct. 2704 (quoting *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982)). *See also Washington*, 388 U.S. at 23, 87 S.Ct. 1920 (finding a constitutional violation "because the State arbitrarily denied [the accused] the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant *and material* to the defense.") (emphasis added). Thus, the Supreme Court has emphasized, "[t]he exclusions of evidence that we declared unconstitutional in [*Rock, Washington*, and *Chambers*] significantly undermined fundamental elements of the accused's defense." *Scheffer*, 523 U.S. at 315, 118 S.Ct. 1261.

**31.** *See Valenzuela–Bernal*, 458 U.S. at 867–68, 102 S.Ct. 3440.

**32.** *United States v. Lopez–Alvarez*, 970 F.2d 583, 588 (9th Cir.1992). *See also DePetris v. Kuykendall*, 239 F.3d 1057, 1063 (9th Cir. 2001) ("Because this evidence was *critical to her ability to defend against the charge*, we hold that the exclusion of this evidence violated petitioner's clearly established constitutional right to due process of law—the right to present a valid defense as established by the Supreme Court in *Chambers* and *Washington*.") (emphasis added); *Turpin v. Kassulke*, 26 F.3d 1392, 1396 (6th Cir.1994) (stating that due process requires the admission of particular defense evidence if it is "critical," exculpatory, and trustworthy); *Potier v. State*, 68 S.W.3d 657, 665 (Tex.Crim.App.2002) (surveying case law and holding that "the exclusion of a defendant's evidence will be constitutional error only if the evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense").

**33.** *See Valenzuela–Bernal*, 458 U.S. at 868, 102 S.Ct. 3440 (" 'The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt.... This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.' " (quoting *United States v. Agurs*, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976))). In this respect, the Supreme Court has made clear that broad constitutional guarantees designed to ensure the overall fairness and reliability of the criminal trial, such as the defendant's rights to obtain and utilize witnesses and other evidence and his right to the effective assistance of counsel, differ from guarantees of specific procedures to be followed at trial such as the right to confrontation. The broad guarantees are "recognized not for [their] own sake, but because of the effect [they have] on the ability of the accused to receive a fair trial." *United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Consequently, "[a]bsent some effect of challenged conduct on the reliability of the trial process, the [broad] Sixth Amendment guarantee is generally not implicated." *Id.* (citing, *inter alia*, *Valenzuela–Bernal*, 458 U.S. at 867–869, 102 S.Ct. 3440). The specific procedural guarantees also are intended to help achieve fairness in the end, of course. But "[i]f a 'particular guarantee' of the Sixth Amendment is violated, ... [n]o additional showing of prejudice is required to make the violation 'complete.' " *Bullcoming v. New Mexico*, —— U.S. ——, ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011) (discussing denial of confrontation (internal quotation marks omitted)). *See also Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (explaining that because "the focus of the Confrontation Clause is on individual witnesses," where cross-examination has not been precluded but

cases have evinced that focus. "[F]or example," we stated in *Clark v. United States*, an error is of constitutional magnitude if it "wholly deprived" the defendant of "any opportunity" to present evidence on a "central issue" in the case.[34] In contrast, we observed, "[i]f the issue is merely collateral, or where ample cross-examination has already been allowed or evidence admitted on a particular issue, trial court curtailment of the defendant's presentation does not implicate the defendant's Sixth Amendment rights" even if the excluded evidence is favorable to the defendant.[35] *Clark* thus identified the two ends of the materiality spectrum, as it were. Subsequent decisions have held that the erroneous exclusion of defense evidence may violate the accused's constitutional right even if the accused is not "wholly deprived" of the opportunity to present a defense, so

long as the excluded evidence is sufficiently critical to the defense.[36]

The present case also involves a less-than-total interference with the presentation of defense evidence on a central issue at trial (namely, the reliability of the eyewitness identifications of appellant). But while our past cases envision the possibility of a constitutional challenge in these circumstances, they have not articulated a standard of materiality to use in judging when an erroneous evidentiary ruling resulting in exclusion of defense evidence rises to the level of a constitutional violation. The standard of materiality implicit in our cases is amorphous and unclear.[37] It is desirable to clarify the standard so that we may resolve the question in this and future cases on a principled, rational, and proper basis.

has been curtailed, "the prejudice inquiry in determining whether the confrontation right has been violated must be on a particular witness, not on the outcome of the entire trial").

**34.** 639 A.2d 76, 81 (D.C.1993).

**35.** *Id.* at 82. We note an arguable ambiguity in this observation: It is unclear whether the adjective "ample" was intended to modify the word "evidence" as well as the word "cross-examination."

**36.** *See, e.g., Scott v. United States*, 975 A.2d 831, 839 (D.C.2009) (finding constitutional error where trial court erroneously precluded the defendant from introducing cell phone records corroborating a defense witness's alibi testimony that the defendant was on the telephone with her at the precise time of the shooting of which he was accused; "[w]e cannot agree that, by itself, the testimony of [the defense witness], lacking as it [was] in important details and vulnerable to withering impeachment, provided Scott with a meaningful opportunity to present the defense he sought to put before the jury"). *See also In re D.E.*, 991 A.2d 1205, 1212 (D.C.2010) (finding constitutional violation in exclusion of one defense witness to charged assault even

though a second defense eyewitness testified); *McDonald v. United States*, 904 A.2d 377, 381 (D.C.2006) (trial court's preclusion of defendant from testifying about his injuries during his arrest held unconstitutional, though defendant was able to present "some evidence" of his injuries through his wife's testimony; "for that opportunity [to present a defense] to be meaningful, it must be full and fair, not arbitrarily and significantly curtailed"); *Howard v. United States*, 656 A.2d 1106, 1118 (D.C. 1995) (constitutional error to exclude evidence of prior assaults by the complainant that would have supported the defendant's self-defense claim; although the defendant made brief reference to those assaults in his own testimony, "that testimony was so cryptic—so devoid of details, including a time reference—that we ... cannot say Howard had any meaningful opportunity to present his evidence on provocation/mitigation," even if he was not "wholly deprived" of the opportunity to do so).

**37.** *Clark* did not purport to prescribe such a standard in its example of an erroneous exclusion that "wholly" deprives the defendant of the opportunity to present evidence on a central issue, nor do we perceive a rationale (or support in the case law) for adopting that as the test.

The United States Court of Appeals for the Second Circuit has taken the lead in developing an objective materiality test "[t]o isolate those few situations" in which erroneous evidentiary rulings unconstitutionally restrict the accused's ability to present a defense.[38] Borrowing the materiality standard set forth in *United States v. Agurs*[39] for determining whether a prosecutorial failure to turn over exculpatory evidence to the defense violates due process (a so-called *"Brady* violation"[40]), the Second Circuit holds that whether an erroneous exclusion of defense evidence violates the defendant's constitutional right to present a defense "depends upon whether 'the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.' "[41]

The test adopted by the Second Circuit has much to recommend it.[42] It reflects the purpose of the constitutional guarantee to enable the defendant "to put before a jury evidence that might influence the determination of guilt."[43] We think it appropriate, however, to clarify and rephrase the test in one important respect.

The test cannot literally be whether the appellate court finds that the omitted evidence creates a reasonable doubt of the defendant's guilt. Except in the clearest of cases, such a finding is the province of a jury (or other trier of fact) that considers the live testimony and other evidence placed before it—not of an appellate court that has only a cold paper record to assess. Normally the most an appellate court can say, with a greater or lesser degree of conviction, is that the excluded evidence could have given the jury a reason to doubt. Moreover, to state that materiality depends on whether the excluded evidence affected the outcome of the trial "does not establish a standard of materiality because it does not indicate what quantum of likelihood there must be that the undisclosed evidence would have affected the outcome."[44]

---

**38.** *Agard v. Portuondo*, 117 F.3d 696, 705 (2d Cir.1997), *rev'd on other grounds*, 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000).

**39.** 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

**40.** *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**41.** *Justice v. Hoke*, 90 F.3d 43, 47 (2d Cir. 1996) (quoting *Agurs*, 427 U.S. at 112, 96 S.Ct. 2392; alteration in the original). "On the other hand," the Second Circuit has explained, "if the evidentiary ruling was correct pursuant to a state evidentiary rule, our inquiry is more limited. We consider whether the evidentiary rule is arbitrary or disproportionate to the purposes it is designed to serve." *Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir.2006) (internal quotation marks and brackets omitted) (citing, *inter alia, United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)).

**42.** We note that the Sixth Circuit has approved the test enunciated by the Second Circuit, *see United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir.2006), and the Tenth Circuit also follows a similar rule. *See Richmond v. Embry*, 122 F.3d 866, 872 n. 5 (10th Cir.1997) ("[T]he Supreme Court has dictated a 'materiality,' or outcome-driven test," which focuses on whether admitting the evidence would have "create[d] reasonable doubt that did not exist without the evidence.") (citing *United States v. Valenzuela–Bernal*, 458 U.S. 858, 868, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982)).

**43.** *Taylor v. Illinois*, 484 U.S. 400, 408, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (internal quotation marks and citation omitted). Thus, the Second Circuit has noted, "[i]n a close case, 'additional evidence of relatively minor importance might be sufficient to create a reasonable doubt' " and hence satisfy its test of materiality. *Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir.2000) (citations omitted).

**44.** *United States v. Bagley*, 473 U.S. 667, 681 n. 12, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

The lack of a principled, workable materiality test is the problem that has plagued prior cases. For all the foregoing reasons, we think it necessary to reformulate the Second Circuit's test of unconstitutionality to reflect how likely it must be that the erroneously excluded evidence would have given the jury an otherwise-nonexistent reasonable doubt. Our choices are limited. As discussed above, it is well established that not every erroneous exclusion of evidence favorable to the defendant violates the defendant's constitutional right to present a defense. And in other contexts involving comparable claims of interference with the ability to present a defense, the Supreme Court has held that "a defendant cannot establish a constitutional violation simply by demonstrating that an alleged trial-related error could or might have affected the jury." [45] Thus, the bare possibility of prejudice cannot suffice to show that the defendant actually was deprived of a meaningful opportunity to present a complete defense. At the opposite extreme, we cannot demand certainty that the excluded evidence would have generated a reasonable doubt—a simply unknowable proposition. Even to require a showing that the evidence more likely than not would have led to an acquittal is too rigorous and unrealistic, in our view. As the Supreme Court has held in addressing *Brady* violations and ineffective assistance of counsel claims, a preponderance of the evidence standard is inadequate to ensure that the defendant received a fair trial.[46]

In the end, we are hard-pressed to come up with a better standard than the intermediate one required in the *Brady* context by the Supreme Court's post-*Agurs* decisions. Under the Court's reformulation of *Agurs's* materiality requirement, evidence withheld by the prosecution is material for due process purposes only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." [47] In other words, it must be reasonably probable (and not merely possible) that the jury would have harbored a reasonable doubt regarding the defendant's guilt if the evidence had not been suppressed. Yet the reasonable probability standard of materiality is not as demanding as a preponderance-of-the-evidence test:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' [48]

Notably, the reasonable probability standard is also the test of materiality the Supreme Court has employed for a violation of the Compulsory Process

---

**45.** *Boyde v. California,* 494 U.S. 370, 381 n. 4, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

**46.** *See Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**47.** *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. *See also Strickler v. Greene,* 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)

("[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.").

**48.** *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375).

Clause,[49] to which the constitutional right to present a defense is closely related. We think it most sensible to incorporate the reasonable probability standard into the Second Circuit's test. We hold, therefore, that whether an erroneous exclusion of defense evidence violates the defendant's constitutional right to present a defense depends upon whether *there exists a reasonable probability* that the omitted evidence, evaluated in the context of the entire record, would have led the jury to entertain a reasonable doubt that did not otherwise exist. Where such a reasonable probability exists, it makes sense to say the erroneous evidentiary ruling deprived the defendant of his constitutional right to a meaningful opportunity to present a complete defense. But if there is no reasonable probability that the outcome of the trial would have been different, we are prepared to conclude that the error was not so grave as to deprive the defendant of the meaningful opportunity guaranteed by the Sixth Amendment and the Due Process Clause—in other words, it was not constitutional error.

Although the proposition is not self-evident, the Supreme Court has stated that the reasonable probability standard of materiality "would recognize reversible constitutional error only when the harm to the defendant was *greater* than the harm sufficient for reversal under *Kotteakos* " for errors that do not implicate constitutional rights.[50] If an evidentiary error in the exclusion of defense evidence is harmless under *Kotteakos*, it therefore cannot be material enough to amount to an error of constitutional magnitude. Conversely, if the error is sufficiently prejudicial to require reversal under *Kotteakos*, there seldom if ever will be any need for this court to consider on direct appeal whether a constitutional violation occurred. In other words, the *Kotteakos* analysis will be dispositive.[51]

---

49. *See United States v. Valenzuela–Bernal*, 458 U.S. 858, 874, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (holding that government's deportation of an alien defense witness violates the Compulsory Process Clause "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact"). The same test ordinarily is employed in determining whether a defendant has received ineffective assistance of counsel. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

50. *Kyles*, 514 U.S. at 436, 115 S.Ct. 1555 (emphasis added). *See also United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("Unless every nondisclosure is regarded as automatic error, the constitutional standard of materiality must impose a higher burden on the defendant [than the *Kotteakos* standard of harm]."); *Fry v. Pliler*, 551 U.S. 112, 126, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (Breyer, J., concurring in part and dissenting in part) (suggesting constitutional error is not necessarily shown by fact that exclusion of defense evidence is not harmless under *Kotteakos:* "[a] garden-vari-

ety nonharmless misapplication of evidentiary principles normally will not rise to the level of a constitutional, *Chambers*, mistake.").

51. That said, we also note that a reasonable probability of a different trial outcome necessarily means that the erroneous exclusion of evidence was not harmless beyond a reasonable doubt (the *Chapman* standard of harmlessness for constitutional error). *See Kyles*, 514 U.S. at 435–36, 115 S.Ct. 1555. Thus, as with *Brady* violations, when the evidentiary error is found to be a constitutional violation, no further harmlessness inquiry is required to find reversible constitutional error—by definition, the possibility of prejudice is sufficiently great that reversal is required. It may be necessary for us to emphasize that we do not propose a new construction of the *Chapman* harmlessness test, as the dissent contends. *Post* at 291–92. Rather, we acknowledge a reality already implicit in our case law—that it is never necessary to engage in *Chapman* analysis, because once we are satisfied that the error is of constitutional magnitude, reversal invariably is required.

## B. The Probative Value of Dr. Van Wallendael's Proffered Testimony

■ In order to determine whether appellant was prejudiced by the exclusion of Dr. Van Wallendael's proffered testimony, we must assess its value to appellant's defense. The court's ruling did not wholly or even substantially deprive appellant of the opportunity to present evidence challenging the reliability of the eyewitnesses' identification testimony. Examining the expert's testimony not in a vacuum, but in the context of appellant's trial, we perceive no reasonable probability that it would have created an otherwise-nonexistent reasonable doubt of appellant's guilt in the minds of the jury. Rather, we find it highly probable that the trial court's presumptively erroneous exclusion of the testimony made no difference to the outcome of appellant's trial. We therefore conclude that the putative error was non-constitutional—it did not deprive appellant of a meaningful opportunity to present a complete defense—and harmless in *Kotteakos* terms.

We reach these conclusions because Dr. Van Wallendael's proffered testimony simply had too little to say about the identifications it was meant to undercut. Dr. Van Wallendael would have opined that stress, weapon focus, and deficient police procedures reduce the reliability of identifications made by crime victims and witnesses of unknown perpetrators, and that some misidentifications of strangers may be attributable to a phenomenon known as "unconscious transference." [52] In the first place, this expert testimony would have been of scant relevance to the identifications of appellant by Ms. Ervin and Ms. Carter, whatever the reliability of those identifications, because they already knew appellant at the time of the shooting. There is no indication that their ability to recognize him as one of the shooters was impaired by any of the factors Dr. Van Wallendael would have discussed, or that an unconscious transference was at work in their cases. [53]

The target of the expert's testimony would have been Ms. Edwards, the one identification witness to whom appellant was a stranger. Even so, Dr. Van Wallendael's expertise would have been unlikely to help the jury evaluate her identification. Ms. Edwards did not claim she saw appellant's face during or after the shooting; rather, she claimed to remember him as one of the men she saw approaching the car before the attack, at a time when she was at ease and not aware of any threat. Dr. Van Wallendael's testimony that stress and weapon focus may undermine an iden-

---

**52.** As explained above, an unconscious transference is said to occur when a witness, having been exposed to a previously unknown person in an innocent context, unconsciously transfers that person's identity to the perpetrator of the crime without recollecting the earlier exposure to the person.

**53.** *See Hager v. United States,* 856 A.2d 1143, 1148–49 (D.C.2004) (deeming it "highly questionable" whether expert witness could have rendered a reasonable opinion or been helpful to the jury where the "studies on which [the expert] would have relied concern[ed] the reliability of a stranger identification, not an identification of a person known to the wit-

ness, as in this case"). In noting this, we do not impose a *per se* rule that there can be no prejudice in excluding expert testimony regarding eyewitness reliability if the eyewitnesses knew the person they identified. And contrary to the dissent, we certainly do not "state that, as a matter of law, identifications of known acquaintances are inherently stronger than identifications of strangers without looking at the other evidence in the particular case." *Post* at 290. Where the defense seeks to present expert testimony bearing on the reliability of non-stranger identifications, its exclusion might be prejudicial. In this case, however, no such expert testimony was proffered.

tification based on observations made under the influence of those factors therefore would have been beside the point. Appellant did not proffer that the circumstances of the shooting would have influenced Ms. Edwards's memory of preceding events.[54] Similarly, so far as appears, Dr. Van Wallendael would not have identified any significant flaws in the procedure through which Ms. Edwards selected appellant's photograph.[55]

Appellant hangs his hat on Dr. Van Wallendael's testimony regarding the "unconscious transference" phenomenon. He argues that this phenomenon would have explained how Ms. Edwards could have misidentified appellant as a result of having glimpsed him on the scene in the immediate aftermath of the shooting. But even assuming that, after a hearing, the trial court would have found the expert's testimony to be admissible under the criteria set forth in *Dyas*,[56] the proffer stated only that an unconscious transference "can" occur. Among other things, the proffer said nothing about the prevalence of the phenomenon, the conditions under which it is likely to occur (or whether those conditions were present in this case), or how it may be recognized or ruled out. At most, in other words, it appears from the record that Dr. Van Wallendael might have testified that an unconscious transference was theoretically possible in this case, but not that it was likely or probable under circumstances resembling Ms. Edwards's experience. The possibility of an unconscious transference depended, moreover, on whether Ms. Edwards in fact saw appellant on the scene after the shooting. But Ms. Edwards did not remember seeing him there, and there is no evidence establishing that she did see him.

Further, Dr. Van Wallendael's testimony would not have undermined the central strength of the prosecution's case: the fact that Ms. Ervin and Ms. Edwards *independently* identified appellant as one of the shooters without having communicated with each other and without having

---

54. The proffer merely stated that stress "may make the eyewitness less likely to process all the incoming information and retain an accurate memory of details." Even on appeal, appellant argues only that stress and the presence of a weapon make a witness "less observant of a perpetrator's identifying features." Appellant's Brief at 28. He does not assert that Dr. Van Wallendael could have testified that Ms. Edwards's stressful encounter would have affected her earlier observations. While it "does not seem unlikely" to our dissenting colleague that "enduring near-death trauma immediately subsequent to the imprint of a particular memory may affect the accuracy of that specific memory upon later recall," *post* at 288, appellant has not claimed that his expert could have furnished such an opinion.

55. At most, it appears, Dr. Van Wallendael could have described certain "best practices" that were not followed, such as the presentation of photographs to a witness serially or sequentially rather than all at once. Appellant did not proffer that the expert would have opined that the procedure actually followed by the police was unduly suggestive or otherwise likely to have resulted in a mistaken identification.

56. Although the proffer may have been sufficient in other respects to oblige the trial court to hold a *Dyas* hearing, it said hardly anything to suggest that Dr. Van Wallendael's proposed testimony regarding "the scientific research on Unconscious Transference" would meet the *Dyas* criteria. The proffer stated only that the alleged phenomenon "is an area of expert testimony and thus, the use of an expert that has the requisite skill and knowledge to discuss and explain the phenomen[on] to a trier of fact is necessary." These bare assertions indicate that unconscious transference is an esoteric subject of research, but not that the existence of the phenomenon or the methodology used to identify it had gained general acceptance in the relevant scientific community, or (if so) that the state of scientific knowledge regarding unconscious transference permitted a reasonable opinion to be expressed even by an expert.

learned that appellant was a suspect (not to mention the added fact that their identifications were corroborated by Ms. Carter). Viewing the witnesses' identifications in isolation, the jury potentially could have discounted them: Perhaps Ms. Ervin had a motive to frame appellant in order to obtain the benefits of her cooperation agreement, and perhaps Ms. Edwards's visceral reaction when appellant entered her store could be attributed to her unconscious memory of his presence on the scene after the shooting. (And perhaps Ms. Carter simply mistook the person she saw running from the scene for appellant because they did, in fact, resemble each other.) But the witnesses' identifications of appellant were mutually reinforcing, and that made the alternative explanations advanced by the defense less probable. The defense offered no explanation, other than sheer coincidence, for how Ms. Ervin, supposedly looking for someone to frame, happened to pick the one innocent person who, though innocent, would so distress Ms. Edwards in a chance meeting at her place of work some eight months after the shooting. Dr. Van Wallendael's testimony would not have made such an unlikely coincidence seem plausible.

Finally, the exclusion of the identification expert's testimony did not foreclose appellant from mounting a vigorous challenge to Ms. Edwards's identification of him. Appellant conducted "ample cross-examination" of Ms. Edwards on her ability to observe and identify the shooters.[57] Notably, defense counsel cross-examined her about her post-traumatic reconstruction of events and her lack of a clear view during the attack, leaving little to be gained from an expert's pronouncements on stress and weapon focus. Counsel also interrogated Ms. Edwards about her adverse reactions to other men besides appellant who had dark complexions and dreadlocks. In closing, the defense emphasized the realistic possibility that Ms. Edwards had made a mistake in identifying appellant.[58] Appellant was able to urge the jury to draw the common-sense inference that Ms. Edwards had mistaken appellant for one of the shooters based on her confused memories of the event and the similarity in appearance between the two men. To be sure, the jury did not hear about the abstract possibility of an unconscious transference, to which only an expert could have testified. But we are persuaded that testimony as limited as that which appellant proffered would not have made a difference.[59]

The dissent contends that the prosecution's evidence was "weaker" in this case than it was in either *Russell v. United States*[60] or *Benn II*,[61] where we found reversible error in the trial court's failure to hold a *Dyas* hearing on expert identification testimony proffered by the defense.[62]

57. *Clark v. United States*, 639 A.2d 76, 82 (D.C.1993).

58. Defense counsel called upon the jurors' commonplace experiences to frame the misidentification concept, asking "how many times in your life have you perhaps walked up on someone that you ... knew ... [a]nd you realize that you are wrong.... That is what is going on here."

59. We do not suggest, contrary to our holding in *Benn II*, that cross examination of lay witnesses can serve as an adequate substitute for the presentation of relevant scientific evidence. Rather, we simply point out that the primary weaknesses in Ms. Edwards's testimony were already before the jury, and the theory of an unconscious transference would have done little to undermine her credibility further or bolster the defense argument.

60. 17 A.3d 581 (D.C.2011).

61. 978 A.2d 1257 (D.C.2009).

62. In both *Russell* and *Benn II*, we found that the trial court's mistakes could not be deemed harmless under the *Kotteakos* test for non-

But the question is not whether the identification testimony was strong or weak; it is whether Dr. Van Wallendael's proffered testimony could have influenced the jury's decision in light of the facts in this particular case. In both *Russell* and *Benn II*, the proffered expert testimony was material to the credibility of each of the government eyewitnesses. In *Russell*, for example, expert opinion regarding weapons focus was highly relevant, because the victim in that case based his identification at least in part on observations he made *during* the armed robbery, even though he also happened to have seen his attacker prior to the crime.[63] Similarly, in *Benn II*, the proffered expert testimony addressed the "unreliability [of] stranger-to-stranger eyewitness identifications," and the government's case hinged on five such identifications that were not independent: The witnesses were able to confer between their viewings of the photographic lineup, and they gave suspiciously similar responses, with three of them stating in identical language that they were "95% certain" they had identified the correct man.[64] In contrast to the potentially material expert testimony proffered in *Russell* and *Benn II*, the proffered testimony in the present case would have been of scant relevance to the jury's evaluation of the identifications.

In sum, the probative value to appellant's defense of Dr. Van Wallendael's proffered testimony was slight at best. We see no reasonable probability that its putatively erroneous exclusion contributed to the verdict against appellant. Therefore, although the trial court did not evaluate the admissibility of the testimony under the *Dyas* criteria in accordance with our opinion in *Benn II*, we will not remand for the court to conduct that inquiry now. The error, if any, was non-constitutional and harmless.

### III.

For the foregoing reasons, we affirm appellant's convictions. Because his convictions on two counts of possession of a firearm during a crime of violence ("PFCV") merge,[65] we remand the case for the trial court to vacate one of them and determine whether re-sentencing on the remaining counts is necessary to effectuate its original sentencing plan.[66]

*So ordered.*

---

constitutional error. In neither case did we reach the question of whether the error was constitutional in nature. *See Russell*, 17 A.3d at 589; *Benn II*, 978 A.2d at 1283.

**63.** *See Russell*, 17 A.3d at 583–84. The expert in *Russell* also would have opined on the relative accuracy of identifications by police officers, the effect of presenting a suspect in clothing similar to that worn by the perpetrator, and memory errors caused by the receipt of post-event information, all of which could have been relevant and material because one of the two eyewitnesses was a police officer; the eyewitnesses identified appellant at the scene of his arrest while he was wearing similar clothing to that of the suspect; and the victim was unable to make an identification until appellant was asked to pull the hood of his sweatshirt up in the manner in which it had been worn by the assailant. *Id.* at 584–85.

**64.** *Benn II*, 978 A.2d at 1262, 1264.

**65.** One of the PFCV convictions was for possession of a firearm during the murder of Mr. Carter, and the other was for possession of the same firearm during the assault against Ms. Edwards. The government agrees that because it proved a "single possession of a single weapon during a single violent act," the two convictions merge. *Nixon v. United States*, 730 A.2d 145, 153 (D.C.1999) (holding that PFCV convictions merged where the defendant shot into a car containing several individuals during a single event using a single firearm).

**66.** *See Garris v. United States*, 491 A.2d 511, 514 (D.C.1985). Appellant was sentenced to

BLACKBURNE–RIGSBY, Associate Judge, dissenting:

I fear that the majority opinion today takes us a step backward in terms of the value we place on expert testimony regarding the reliability of eyewitness testimony. Aside from my concerns regarding the majority's harmlessness determination in light of *Benn v. United States (Benn II)*, 978 A.2d 1257 (D.C.2009), and *Russell v. United States*, 17 A.3d 581(D.C.2011), I have difficulty reconciling the new materiality test proposed by the majority with some of our other previous cases. For these reasons, I respectfully dissent from the decision of the court.

## I.

In the present case, the government concedes that the trial court erred, because its ruling "does not satisfy *Benn II's* procedural requirements, [thus] it does not reflect a proper exercise of discretion under current law." Error conceded, the only issue before us is whether such conceded error was prejudicial, and therefore requiring of remand. The majority determines that appellant suffered no prejudice here because "the probative value to appellant's defense of Dr. Van Wallendael's proffered testimony was slight at best. We see no reasonable probability that its putatively erroneous exclusion contributed to the verdict against appellant." Maj. op. at 285. The majority's analysis here cannot be reconciled with the analysis we recently employed in *Russell, supra,* 17 A.3d at 583, and *Benn II, supra,* 978 A.2d at 1261. Both *Russell* and *Benn II* dealt with the erroneous exclusion of expert tes-

timony proffered to discuss the reliability of eyewitness identifications. Both of these cases dealt with convictions based solely upon the eyewitness testimony of multiple witnesses. In both of these cases, we found prejudicial error and remanded for a *Dyas* hearing. In *Benn II*, we found that the error was a *Kotteakos* violation without conducting any *Chapman* constitutional error analysis. 928 A.2d at 1283. In *Russell*, we determined that the erroneous exclusion of Dr. Van Wallendael's testimony—the very same expert excluded here—constituted prejudicial error under both *Chapman* and *Kotteakos*. 17 A.3d at 589.

We have recognized that the modern developments in relevant scientific studies and case law regarding the reliability of eyewitness testimony mandate more than mere cursory scrutiny of proffered expert witness testimony. *See Benn II, supra,* 978 A.2d at 1277–78. Much has changed since our decision in *Dyas v. United States,* 376 A.2d 827, 832 (D.C.1977).[1] Nearly thirty-four years ago, in *Dyas, supra,* 376 A.2d at 832 (citing *United States v. Amaral,* 488 F.2d 1148, 1152–53 (9th Cir.1973)), we determined that expert testimony regarding the reliability of eyewitness testimony "was *not* beyond the ken of the average layman ... [and that such testimony] would not aid the jury in evaluating a witness' testimony because the jury would be able to assess the witness' credibility based on the 'inconsistencies and deficiencies' brought out on cross-examination." Because of these recent developments in our case law, we will no longer abide a trial court's *per se* exclusion of

consecutive terms of incarceration on the PFCV counts.

**1.** *See Burgess v. United States,* 953 A.2d 1055, 1063 n. 12 (D.C.2008) ("[T]rial judges should be cognizant that the art of inquiry or the scientific methodology governing the psycho-

logical study of eyewitness identification, including cross-racial identification, and also pertinent case law in other jurisdictions, reflect new developments since our 1977 *Dyas* decision....").

expert testimony as being "beyond the ken of average lay persons." *Russell, supra,* 17 A.3d at 586–87. Instead, we now require that a trial court, *"give individualized consideration* to the defense's proffer in the context of the facts in [the particular] case...." *Id.* at 588 (emphasis added). Where the trial court has failed to conduct a factually particularized inquiry, and the excluded testimony constitutes prejudicial error, we remand for such a specific hearing. *See id.; Benn II, supra,* at 1280 ("We remand the case so that the trial judge may properly consider the expert testimony proffered by the defense in the context of the facts of this case.").

In order to find prejudicial error under the lesser *Kotteakos* standard, we must be "unable to say 'with fair assurance, after pondering all that happened, without stripping away the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Andrews v. United States,* 922 A.2d 449, 458 (D.C. 2007) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). In other words, to conclude that an error is harmless under the *Kotteakos* standard, we "must find it *highly probable* that [that] error did not contribute to the verdict." *Wilson–Bey v. United States,* 903 A.2d 818, 844 (D.C.2006) (en banc) (internal quotation marks and citations omitted). Therefore, in order to discern prejudice, it is necessary to examine the specific evidence presented in this case.

Here, the government's evidence of appellant's guilt is weaker than the evidence presented in both *Russell*[2] and *Benn II*.[3] There was absolutely no physical evidence tying appellant to the shooting in this case.[4] Instead, the entirety of the government's case rested on the testimony of three "eyewitnesses": Courtnee Ervin, Danielle Carter, and Felicia Edwards. Referring to them as eyewitnesses is somewhat generous, considering that not a single one of them identified appellant as the shooter until eight months after the shooting. Moreover, the testimony of all three witnesses was fraught with credibility problems. Ms. Ervin, an admitted crack cocaine addict, testified on the government's behalf pursuant to a cooperation agreement.[5] Eight months after the shooting, while in police custody for distribution of cocaine, Ms. Ervin identified ap-

---

**2.** In *Russell,* the government presented evidence that the victim saw his assailant immediately prior to, and during, the time of the robbery. 17 A.3d at 583–84. He then identified appellant as his assailant mere hours after the robbery. *Id.* at 584. The victim's identification was corroborated by the identification testimony of a police officer who chased appellant near the scene of the robbery. *Id.* at 583–584. The victim did not previously know his assailant.

**3.** The appellant in *Benn II* was convicted on the basis of identification testimony made by five members of the same family whose home was invaded by two intruders, one of whom all five witnesses identified as appellant. 978 A.2d at 1263. None of the witnesses previously knew the appellant.

**4.** That is not to say that there was no physical evidence in this case; there was. The police recovered twenty-three shell casings from the scene. None possessed latent fingerprints that were usable for comparison. The police recovered a piece of chewing gum at the scene as well, but they did not test it for the presence of DNA. The police also found three latent fingerprints on the decedent's vehicle. None of the three fingerprints matched appellant's.

**5.** At the time of the trial, Ms. Ervin was facing "thirty and a half" years of incarceration based on pending charges for felony distribution of cocaine and a misdemeanor violation of the Bail Reform Act. Ms. Ervin agreed to cooperate with the government and testify against appellant in exchange for the government allocuting favorably on her behalf at her sentencing.

pellant as one of the individuals involved in the shooting. At trial, Ms. Ervin testified that she was sitting on a wall alongside the 1800 block of Corcoran Street, getting high on crack cocaine, when she heard gunshots and saw appellant shooting into the decedent's car. Her trial testimony that she was sitting relatively close to the shooting flatly contradicted the testimony she had given a year earlier to the grand jury that she was over 120 yards away from the shooting. This was the only witness who identified appellant as the shooter prior to the grand jury hearing that occurred nearly a full year after the shooting.

Ms. Carter, the decedent's sister, did not wait eight months to come forward. She spoke to police on the night of the shooting. She told them that, from the second floor of her mother's house down the block, she saw a man run from her brother's car after she heard gunshots. At the time, she did not identify the man as appellant. In November 2006, one year after the shooting and months after both Ms. Ervin and Ms. Edwards identified the appellant to police, Ms. Carter told the grand jury that despite knowing appellant from the neighborhood, she did not know if the man she saw was appellant because she had "never seen the person's face." Only at trial did Ms. Carter state that she believed the man she saw was appellant, despite conceding that numerous people in the neighborhood matched the physical description of the man she saw running from her brother's car on the night of the shooting.

Therefore, considering the myriad issues with Ms. Ervin's and Ms. Carter's testimony, this case—and the centrality of Dr. Van Wallendael's testimony—hinges largely on Ms. Edwards' testimony. And, in fact, Ms. Edwards' testimony shares many similarities with that of the victim in *Russell*. In *Russell*, as here, the victim origi-

nally saw the appellant approaching—seemingly innocently—from the safety of the victim's car. *See* 17 A.3d at 583. Yet, the majority's reasoning here diverges sharply from the reasoning in our decision in *Russell*, where we determined that Dr. Van Wallendael's proffered testimony remained "relevant and material" even though the victim originally saw the attacker's face as he approached the car before the attack, at a time when the victim was at ease and not aware of any threat. *Id.* at 589. The majority's conclusion, seemingly unsupported by any psychological authority, that Dr. Van Wallendael's proffered testimony would have been "beside the point" is particularly puzzling. Maj. op. at 283. The majority seems to suggest that the human brain works similarly to a digital camera—capturing perfect memories if not immediately threatened. This is not persuasive. To the contrary, it does not seem unlikely that enduring near-death trauma immediately subsequent to the imprint of a particular memory may affect the accuracy of that specific memory upon later recall. Regardless, this disagreement among members of this division as to the biological mechanisms of the human mind is one that is likely to be shared by members of the jury, and this is precisely why given the facts of this case Mr. Heath is deserving of a *Dyas* hearing. Dr. Van Wallendael, a proffered expert on the psychology of eyewitness identification, is better equipped to explain this phenomenon. At a minimum, she should have the opportunity in a *Dyas* hearing to explain why she is qualified to give an expert opinion on this issue.

Even more troubling is that the victim's identification here is significantly weaker than the victim's identification in *Russell*. There, the victim identified his assailant mere hours later at a show-up identification arranged by the police upon a description originally provided by the victim.

*Russell, supra,* at 583–84. Here, Ms. Edwards based her identification of appellant upon a bizarre psychosomatic reaction. Ms. Edwards testified that, eight months after the shooting occurred, when appellant walked into the store where she worked she became physically ill. Ms. Edwards conceded that she had experienced similar physical reactions in the months after the shooting when she saw other tall men who, like appellant, wore dreadlocks. She asserted, however, that her physical reaction to appellant was more powerful and disturbing. Despite this reaction, Ms. Edwards still was unable to identify appellant as the man who shot her and Mr. Carter until months later when she testified in front of the grand jury. The majority voices its skepticism regarding the existence of the phenomenon of "Unconscious Transference," to which Dr. Van Wallendael's proffered testimony related, and yet affirms a case built upon an identification made by a witness' physical and psychosomatic reaction. In such a case, Dr. Van Wallendael's testimony was material and relevant to appellant's defense. "Without expert testimony to provide a foundation for [her] arguments, defense counsel could only make unsupported assertions in closing argument." *Benn II, supra,* 978 A.2d at 1283. The evidence in this case is even weaker than the evidence in *Russell* and *Benn II,* and therefore provides less assurance that the judgment here was not substantially swayed by the trial court's *Dyas* error. *See id.* (citing *Kotteakos, supra,* 328 U.S. at 764–65, 66 S.Ct. 1239).

The majority attempts to distinguish this case from *Russell* and *Benn II* on the strength of two legal arguments: (1) "the exclusion of the identification expert's testimony did not foreclose appellant from mounting a vigorous challenge to Ms. Edwards's identification" due to appellant's ability to cross-examine; and (2) Dr. Van Wallendael's proffered testimony "would have been of scant relevance to the identifications of appellant by Ms. Ervin and Ms. Carter" in light of our decision in *Hager v. United States,* 856 A.2d 1143, 1148–49 (D.C.2004). Neither of these arguments are persuasive. This court previously rejected the majority's cross-examination argument in *Benn II* and *Russell.* Specifically, in finding harm under both the *Chapman* and *Kotteakos* standards in *Russell,* we determined that "[w]e are not persuaded that the fact that appellant cross-examined vigorously the eyewitnesses and argued the shortcomings of the identifications to the jury to the extent that he could means that he had a meaningful opportunity to present his misidentification defense." 17 A.3d at 589. That determination was built upon our conclusion that "[a]ppellant's proffered scientific theories could not be developed on the cross examination of lay witnesses." *Id.* (citing *Benn II, supra,* 978 A.2d at 1279). As we have noted in a prior case finding a *Kotteakos* violation, "[a]lthough it is true that [appellant's] counsel was free to make [his] argument, however, the judge's ruling deprived him of any evidence to back up his claim. . . ." *Andrews, supra,* 922 A.2d at 461 n. 18. The majority does the same here.

As for the majority's *Hager* argument, I think it misconstrues our analysis in that case. True, in *Hager* we found no abuse of discretion in the trial court's refusal to allow the defendant to call an expert witness on the issue of the accuracy of eyewitness testimony.[6] 856 A.2d at 1149. It

6. Our holding in *Hager* is unsurprising considering its place in the chronology of the development of our case law in the area of expert testimony about eyewitness identifications. We decided *Hager* nearly four years prior to our acknowledgment in *Burgess, su-*

is also true that we found that the proffered expert testimony had little probative value considering that most of the studies cited by the expert dealt with the accuracy of identifying strangers as opposed to previous acquaintances. *Id.* at 1148–49. However, in *Hager*, we also thoroughly discussed the "corroboration" of the identification through other evidence, namely: (1) the appellant's fingerprints on the murder weapon; (2) admissions by the appellant to two other witnesses that he killed someone on the street where the victim lived; and (3) a witness who testified that he saw appellant holding a gun identical to the murder weapon. *Id.* at 1149–50. There is no similar corroborative evidence in this case—no corroborative physical evidence at all (despite the recovery of bullet shells and fingerprints at the scene) and no evidence of inculpatory statements. Ms. Ervin and Ms. Carter may have previously known appellant, but it is difficult to conceive that—considering all of the flaws in Ms. Ervin's and Ms. Carter's testimony— the majority would equate the strength of this evidence with the corroborating evidence in *Hager*. Indeed, the inherent weaknesses of Ms. Ervin's and Ms. Carter's testimony make the reliability of Ms. Edwards' testimony even more crucial, and the proffered testimony of Dr. Van Wallendael even more material to the evidence of appellant's guilt. Thus, this case falls within the orbit of *Benn II* and *Russell*.

The majority seems to suggest that *Hager* stands for the proposition that there is no error in excluding expert testimony regarding eyewitness reliability when the eyewitnesses know the assailant. This is an oversimplification of *Hager* and is inconsistent with our *Kotteakos* prejudice analysis. It puts the brakes on the forward progression of our case law in this area to simply state that, as a matter of law, identifications of known acquaintances are inherently stronger than identifications of strangers without looking at the other evidence in the particular case.

The majority warns that we must examine "the expert's testimony not in a vacuum, but in the context of appellant's trial," and I agree. Maj. op. at 282. It is puzzling, then, that the majority disconnects the eyewitness testimony and maintains that "Dr. Van Wallendael's testimony would not have undermined the central strength of the prosecution's case: the fact that Ms. Ervin and Ms. Edwards *independently* identified appellant as one of the shooters without having communicated with each other and without having learned that appellant was a suspect. . . ." Maj. op. at 283–84. That the majority maintains that the "central strength of the prosecution's case" is the *independent* nature of the identifications made by Ervin and Edwards is surprising given concerns expressed by the author of the majority opinion to the government during oral argument:

> [W]e have this hiatus of a few months and, inexplicably, there's nothing in the record that explains this. Suddenly in November, [Edwards] walks into the Grand Jury and she's now saying, "that person that I saw in that photo is, was the shooter." "El was the shooter." And this is bizarre to me, frankly. The

---

pra note 1, 953 A.2d at 1063 n. 12, that there had been new developments in the scientific methodology governing eyewitness identification, and five years prior to our historic holding in *Benn II* that, "[f]or the first time, however, we do not affirm the trial court's exclusion of the proffered expert testimony"

regarding the reliability of eyewitness testimony. *Benn II*, *supra*, 978 A.2d at 1261. This is not to say that *Benn II* overruled *Hager*, but rather that the *Hager* court did not have the benefit of, and was not bound by, our analysis in *Benn II*.

facts in this case are rather bizarre in a number of respects. The question in my mind is: What is it that has happened that has led Ms. Edwards to go from ... identifying the photograph as the man who walked into the store, to identifying [the man in the photograph] as the shooter? How do we know it is independent? What is it the police have told her? [Was it], the mere fact that this photo happens to be in an array? *You know, there's this suggestivity inherent in this in some way, and I'm wondering about whether Edwards' identification is really so independent of Ervin's identification?*

(Emphasis added). These questions are still quite troublesome to me and are, in my view, central to the harm caused to the appellant's case by the trial court's *Benn II* violation. Perhaps, if allowed to testify, Dr. Van Wallendael could have provided the jury with some answers. At the very least, appellant was entitled to the opportunity to have Dr. Van Wallendael testify at a *Dyas* hearing, which the trial court erroneously denied.

In assessing the *Kotteakos* prejudice that results from a *Dyas* violation, we look to the strength of the entirety of the evidence and if we are unable to say with fair assurance that the judgment was not substantially swayed by the error, we must remand for a *Dyas* hearing. *See Benn II, supra,* 978 A.2d at 1283 (citing *Kotteakos, supra,* 328 U.S. at 764–65, 66 S.Ct. 1239). I have no such fair assurance here, and therefore would reverse and remand for a *Dyas* hearing in accordance with *Benn II* and *Russell.*

## II.

Furthermore, I fear that the majority's new test will effectively eliminate any practical distinction between *Chapman* and *Kotteakos* analysis. Under the majority's new materiality test, a *Kotteakos*

analysis is only conducted *after* a thorough *Chapman*-like analysis centered upon a determination of whether *"there exists a reasonable probability* that the omitted evidence, evaluated in the context of the entire record, would have led the jury to entertain a reasonable doubt that did not otherwise exist." Maj. op. at 281. I think this method is somewhat problematic because it greatly differs from how we have addressed the issue of prejudicial error in recent cases. Generally, we address *Kotteakos* first as the default standard of review for prejudicial error. *See, e.g., Benn II,* 978 A.2d at 1283 n. 112 (stating that, after a determination of *Kotteakos* error, "[w]e need not decide whether the more stringent standard for constitutional error applies"); *Andrews, supra,* 922 A.2d at 458 n. 14 ("Because we conclude that the error was prejudicial under *Kotteakos,* reversal would be required *a fortiori* if we were to apply the *Chapman* standard."). Applying a thorough *Kotteakos* analysis first, when it is unclear whether to apply the *Chapman* or *Kotteakos* standard, seems more consistent with not only our case law, but also with the principles of *Chapman* and *Kotteakos* themselves. In a *Kotteakos* analysis, the government bears the burden of proving harmlessness. *See Andrews, supra,* 922 A.2d at 458 (determining that "the government has not satisfied the 'reasonable assurance' standard of *Kotteakos* ...."). In a *Chapman* analysis determining the prejudice of constitutional error, it is the appellant who first must meet a "standard of materiality [that] impose[s] a higher burden on the [appellant]" than the *Kotteakos* harmless-error standard. *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *see also Kyles v. Whitley,* 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (recognizing "reversible constitutional error only when the harm to the defendant [is] greater than the harm sufficient for reversal under *Kotteakos*"). In adopting the ma-

jority's analysis, I am concerned that we run the risk of accidentally engaging in a sort of structural burden-shifting where, if the appellant cannot meet the heightened materiality standard, appellant does not receive a fair *Kotteakos* analysis.

I also question whether the majority's proposed *Chapman* materiality test is consistent with our recent constructions of the *Chapman* standard. For example, in *McCoy v. United States*, 890 A.2d 204, 212 (D.C.2006) (quoting *Hill v. United States*, 858 A.2d 435, 447 (D.C.2004)), we reversed upon a finding of *Chapman* error that characterized the standard as "whether 'overwhelming evidence' existed to support the conviction, independent of the tainted [evidentiary ruling]." The majority's proposed standard strikes me as stricter than our prior characterizations of the *Chapman* standard. It also seems that the majority's standard differs somewhat from the Supreme Court's own characterization of the standard as "whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

For the foregoing reasons, I respectfully dissent.

