# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MULLIGAN, FEBBO, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist ANDREW J. CRISWELL**
**United States Army, Appellant**

ARMY 20150530

Headquarters, Fort Campbell
Steven E. Walburn, Military Judge (arraignment)
Matthew A. Calarco, Military Judge (motions hearing & trial)
Colonel Susan K. Arnold, Staff Judge Advocate (pretrial & recommendation)
Lieutenant Colonel Robert C. Insani, Staff Judge Advocate (addendum)

For Appellant: Captain Matthew L. Jalandoni, JA (argued); Colonel Mary J. Bradley, JA; Major Christopher D. Coleman, JA; Captain Matthew L. Jalandoni, JA (on brief); Major Patrick J. Scudieri, JA; Captain Matthew L. Jalandoni, JA (reply brief).

For Appellee: Captain John Gardella, JA (argued); Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie III, JA; Major Cormac M. Smith, JA; Captain Linda Chavez, JA (on brief).

6 November 2017

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

FEBBO, Judge:

In this case, we hold that the military judge did not abuse his discretion in admitting the victim's in-court identification of Specialist (SPC) Andrew J. Criswell [hereinafter appellant]. We also hold that appellant's defense counsel was not ineffective in failing to submit a discovery request to obtain appellant's Facebook profile picture used for pretrial identification of appellant.

A military judge, sitting as a general court-martial, convicted appellant, contrary to his pleas, of one specification of false official statement, two specifications of abusive sexual contact, one specification of assault consummated by a battery, and one specification of indecent language in violation of Articles 107,

120, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 907, 920, 928, 934 (2012 & Supp. I 2014) [hereinafter UCMJ]. The military judge sentenced appellant to a dishonorable discharge, confinement for two years, and reduction to the grade of E1. The military judge credited appellant with one day of credit against the sentence of confinement. The convening authority approved the sentence as adjudged and credited appellant with one day confinement credit.

This case is before us for review pursuant to Article 66, UCMJ.[1] Appellant assigns four errors on appeal. We find two issues merit discussion, but no relief. We have considered the matters personally asserted by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find they lack merit.

## BACKGROUND

Specialist AM was assaulted at a party. Specialist AM did not know her assailant's name. Appellant also attended the party and stated he spoke to a woman that we conclude could only have been SPC AM. However, appellant denied touching her inappropriately. Specialist AM's friend, SPC Nasser Al-Shamesi, observed appellant at the party and knew mutual friends of appellant. Based on SPC AM's description of her assailant and speaking with appellant's friend from the party, SPC Al-Shamesi found appellant's profile picture on Facebook. Specialist Al-Shamesi provided the picture to Criminal Investigation Command (CID). A CID agent showed the picture to SPC AM and she confirmed appellant was her assailant. At trial, appellant's defense counsel moved to suppress the out-of-court and in-court identification of appellant.

## DISCUSSION

Under our Article 66(c), UCMJ, authority to resolve controverted questions of fact, and recognizing that the trial court saw and heard witnesses, we make the following findings:

In 2014, appellant was twenty-one years old and assigned to Fort Campbell, Kentucky. Appellant is African-American and is five feet ten inches tall. Specialist AM was also assigned to Fort Campbell. Specialist AM is Caucasian, is five feet tall, and weighed ninety-eight pounds. She performed military intelligence duties as an imagery analyst.

On the evening of 2 November 2014, SPC AM attended a dance party at a university in Clarksville, Tennessee. She attended the party with SPC Al-Shamesi

---

[1] The court heard oral argument in this case on 27 June 2017.

and two other male soldiers. They arrived at the party between around 2130 and 2200. Specialist AM and SPC Al-Shamesi had been friends since high-school. When SPC Al-Shamesi entered the party, he observed appellant with several other soldiers, two of the soldiers he knew.

The party was located among and between several rooms of a building at the university. The area was crowded with between 100 and 200 people (a majority African-American), was very noisy from the music, and was very hot. The area was "almost pitch black," except for lights at the entrance of the bathrooms and near the disc jockey (DJ) stand. Later on, around 0200, SPC AM got separated from her friends.

Appellant approached SPC AM as she was standing alone near the DJ stand. Appellant was wearing a black bandana with a white design lying flat on his head, black jeans, a dark blue jacket, and dark blue shirt with a logo. Appellant was also wearing a gold grill piece on the upper row of his teeth. Appellant asked why she was alone and SPC AM made up a story that she was looking for her boyfriend. Specialist AM wanted appellant to leave her alone.

Instead of leaving her alone, appellant pushed SPC AM up against a wall and opined that her boyfriend could not "fuck" her the way he could. Appellant next grabbed SPC AM's face and stuck his tongue into her mouth. He then pulled down his pants enough to expose his penis, and proceeded to rub his erect penis against SPC AM's upper thigh while he grabbed her buttocks with his other hand. Appellant next grabbed SPC AM's hand, placed her hand on his penis, and moved it in a stroking motion. Appellant told SPC AM he "would fuck the shit" out of her "white ass." Appellant made other indecent statements to SPC AM as well. All the while, SPC AM attempted to squirm her way out, and talk her way out of the corner where appellant was assaulting her. Ultimately, appellant grabbed SPC AM's wrists and began to walk her towards the front entrance of the room, near a closet. Along the way, they happened upon two other men and appellant began to whisper to these individuals. Specialist AM was shaking her head telling them "No, no, don't, whatever he says, don't listen." At this point, appellant backed her against the wall, and SPC AM said "leave me alone and just let me go." Appellant replied, "Okay, give me a kiss and I'll go." He then forced SPC AM to kiss him, and he walked away.

Specialist AM texted SPC Al-Shamesi that she wanted to leave the party. Before leaving, SPC Al-Shamesi had to use the bathroom. Specialist AM was standing outside the bathroom door when appellant approached her again and asked why she was still standing by herself. Specialist AM told appellant her "boyfriend" was in the bathroom and to leave her alone. Appellant stated "how about I take you in there and show you how a real man fucks you?" Specialist AM replied "No…I just want to go." Appellant walked away.

3

Specialist AM was very upset and told SPC Al-Shamesi about the assaults. She described her assailant as an African-American male wearing a black bandana with white markings. Specialist Al-Shamesi stopped her description because he thought he knew the identity of her assailant.[2] Specialist Al-Shamesi had observed appellant wearing a black and white bandana on top of his head earlier that evening. The black and white bandana stood out as unusual to both SPC AM and SPC Al-Shamesi because it was just laid on top of appellant's head. They had never observed anyone wear a bandana in a similar manner at other bars or clubs. According to SPC AM and SPC Al-Shamesi, only one person at the club was wearing a bandana in this manner.

Between that evening and the next day, SPC Al-Shamesi was able to determine appellant's identity through texts with a soldier who was with appellant at the dance party, and by asking another soldier from appellant's unit. Specialist Al-Shamesi went onto appellant's Facebook page and obtained his profile picture. Also on the next day after the assault, SPC AM reported the assault to Fort Campbell CID. Specialist Al-Shamesi provided a CID agent his phone where he saved appellant's Facebook profile picture. He also provided the CID agent with appellant's name. The CID agent showed SPC AM the Facebook picture and she confirmed appellant was the same person that assaulted her at the dance party. The CID agent instructed SPC Al-Shamesi to cease any further investigation efforts.

Afterward, CID interviewed appellant. Appellant stated he was at the university dance party that evening during the same times SPC AM was there—between around 2230 and 0230 or 0300. Appellant stated he was wearing blue and black clothing, and a grill piece on his top teeth. He denied wearing a bandana. Instead, according to appellant, he was wearing a black skull cap similar to an Army Physical Training cap.[3] Appellant further admitted that he talked to a "short, skinny,

---

[2] Our dissenting colleague points to SPC AM's description to SPC Al-Shamesi as being "extraordinarily not detailed." However, there is a substantial difference between SPC AM being stopped in describing her assailant immediately after an assault and SPC AM's observations being limited to her assailant being an African-American male wearing a black and white bandana. After the assault and prior to the Article 32, UCMJ, hearing, SPC AM's additional details of her assailant's description included him wearing a black jacket, black jeans, black shirt and a grill piece on his top row of teeth.

[3] Both at trial and on appeal, appellant asserted SPC AM's identification and description of appellant were flawed since he was wearing a skull cap and SPC AM did not describe the lettering and logo on his shirt. As proof of what he was wearing

(continued . . .)

4

real small, white girl." Appellant essentially told CID he spoke with SPC AM.[4] There was enough lighting for appellant to observe that SPC AM was wearing jeans and a polo-shirt with a collar. He was also able to observe her facial expressions. According to appellant, SPC AM was "very flirtatious" based on her body language and the way she looked. However, he denied saying or doing anything inappropriate and denied touching SPC AM. According to appellant, he was married and did not have trouble getting sex from other women. Appellant told CID SPC AM's "boyfriend" knew one of appellant's friends from that evening.[5] Appellant thought it was strange that the night before SPC AM referred to SPC Al-Shamesi as her boyfriend and now the CID agent was telling appellant that the two of them were only friends. Appellant speculated SPC AM's "boyfriend" may have gotten jealous when he saw appellant speaking with SPC AM and she made up a story to "cover her ass."

At arraignment, appellant deferred his pleas. The military judge scheduled the trial date. At the start of a contested trial, appellant entered a plea of not guilty and appellant's defense counsel made an oral motion to suppress the Facebook

---

(. . . continued)
that evening, appellant's defense counsel introduced a group picture of appellant and his friends taken at the party earlier that night. In the group photo from the party, appellant is wearing a dark blue shirt with a design on the front, was wearing a black or dark blue skull cap, and a gold grill piece on the top row of his teeth. The other four friends were wearing either white, or colorful plaid shirts or jackets. However, the photograph does not establish that he could not have replaced his skull cap with a bandana later in the evening when the assault occurred. Appellant's friend from the party testified appellant had previously worn a bandana in the same manner as described by SPC AM.

[4] Based on the record of trial, it is clear that appellant was describing his interaction with SPC AM. The attendees at the dance party were predominantly African-American. There were only three Caucasian females at the party. Out of the three, only SPC AM could be described as short and skinny.

[5] It is clear from the record that appellant is referring to SPC Al-Shamesi. Specialist AM testified that appellant was the only person at the dance party she had to tell she was with her "boyfriend" (SPC Al-Shamesi) in the hope of stopping his indecent language and assaults. In his statement to CID, appellant confirmed he briefly met SPC Al-Shamesi at the entrance to the party and two of appellant's friends knew SPC Al-Shamesi. According to appellant, one of those same friends was contacted by SPC Al-Shamesi to get appellant's name after SPC AM made an assault allegation.

picture of appellant as being unnecessarily suggestive and to suppress any in-court identification of appellant. Since appellant had not entered pleas, the military judge allowed appellant to raise the suppression motion. The military judge deferred ruling on the motion until hearing the government's evidence on the merits. Appellant did not request a continuance or object to the military judge's proposed procedure to consider the motion.

At trial, in addition to the descriptions above, SPC AM testified that her assailant was wearing what looked to be a black jacket, very dark jeans, and a gold grill piece on his upper teeth. She described her assailant as being in his early twenties, and between five feet ten inches, and 6 feet tall. Specialist AM testified that the shape of appellant's face stood out to her. SPC AM did not recall appellant's shirt having a logo.[6]

At trial, two defense witnesses testified that they did not observe appellant wearing a bandana laying on his head.[7] One witness was only with appellant for about ten to fifteen minutes at the dance party. The other witness was only with appellant briefly at the dance party.

After the government presented its case on the merits and rested, the military judge ruled on the suppression motion. The military judge found CID's use of appellant's Facebook picture was unnecessarily suggestive. However, the military judge allowed SPC AM to make an in-court identification of appellant. Afterward, the defense presented its case on the merits.

### A. Deferring Pleas

As a threshold matter we address the Army practice of deferring pleas during arraignment. Our routine review of records for courts-martial reveals the practice of

---

[6] The logo design, however, would have been under appellant's jacket. SPC AM's failure to observe the logo design could reasonably be attributed to numerous factors, including that appellant was in the midst of sexually assaulting her.

[7] One of the defense witnesses had been friends with appellant for about eighteen months. They went out a lot together. Prior to that evening, the defense witness had observed appellant wear a bandana draped on his head at other clubs. He did not observe anyone wearing a bandana on top of their head at the dance party that night. The defense witness testified that appellant was wearing a grill piece that night. The witness could not recall if appellant was wearing a shirt with a logo that night, but confirmed he was wearing the shirt with a logo in their group photo.

deferring the entry of pleas is a matter of course.[8] Our review of records also reveals this practice has resulted in potentially case-dispositive motions being argued without briefs and being presented to military judges at the beginning of trial. We find an orderly system of justice is frustrated when matters are addressed out of sequence. While we find no prejudice to appellant from the practice in this case, indeed the timing of the motion seems tactical and intentional, the result was a less developed record[9] on an important issue. This problem could have been avoided.

Appellant was arraigned on 7 May 2015. Appellant made no motions and stated that he was deferring the entry of pleas. The motions deadline established by the military judge's pretrial order came and went. Appellant filed none.

Then, on 4 August 2015 at the start of the contested trial, appellant was again called upon to enter pleas. Apparently for tactical reasons, the defense waited until the moment appellant was to actually enter pleas before raising a suppression motion. Rule for Court-Martial [hereinafter R.C.M.] 905(b) lists several motions that must be "raised before a plea is entered." Included are dispositive motions and motions that usually require evidentiary hearings, such as motions to suppress evidence, motions based on defects in the charges, discovery, severance, and requests for individual military counsel. In short, it is a list of motions that generally involve threshold issues that need to be decided well before trial.

---

[8] Unlike the deferral of forum selection explicitly contained in Rule for Court-Martial 903(a)(2), there is no explicit reference to deferring entry of pleas within the rules. Nor does the Military Judges' Benchbook provide for the deferral of pleas in the standard arraignment script. Dep't of Army, Pam. 27-9, Legal Services: Military Judges' Benchbook, para. 2-1-3 (16 Sep. 2014). The only arguable suggestion of the practice is the discussion of R.C.M. 904 stating "[a]rraignment is complete when the accused is called upon to plead; the entry of pleas is not part of the arraignment." Thus, the primary purpose of the initial session is complete irrespective of whether pleas themselves are entered. This leaves the only possible authority for the military judge to defer pleas would be his or her general control over the proceedings and authority to grant continuances. *See* R.C.M. 801; R.C.M. 906(b)(1).

[9] Unlike the military judge that had to decide the suppression motion the day of trial, without the benefit of briefs, this appellate court had the benefit of extensive government and defense briefs on the suppression issue, oral argument, and many months to consider the issue.

At trial the defense counsel argued, and the military judge was persuaded, that R.C.M. 905(b) allowed him to ignore the motions deadline established by the pretrial order and raise a suppression motion on the morning of trial because appellant had not yet "entered pleas."  In other words appellant could raise a motion to suppress by either the motions deadline or the entry of pleas—whichever came later. Appellant in this instance was allowed to ignore the motions deadline and surprise the military judge and the government with a suppression hearing.[10]

As a result, a potentially case-dispositive and non-frivolous suppression motion was thrust onto the military judge's lap, moments before a contested trial, without the benefit of prior notice, written motions, or a prepared government evidentiary response.  While there is understandable regulatory flexibility that allows the military judge to set motions deadlines, conduct hearings on motions, and grant continuances, the military judge should not allow this flexibility to be pitted against specific rules to thwart the orderly administration of justice.  In our view, the practice of allowing the deferral of pleas should not be used as a mechanism to allow defense counsel to ignore pretrial deadlines.[11]

We suggest at the initial session a military judge would be well within his right to deny a request to defer pleas and if an accused refuses to enter a plea to then enter one for him.  *See* R.C.M. 910(b).  We recognize the three and five day statutory waiting periods between referral and arraignment provided for special and general courts-martial respectively may often be insufficient for a defense attorney to fully comply with due diligence requirements with respect to R.C.M. 905(b) motions.  *See* Article 35, UCMJ.[12]  We also acknowledge there is no explicit mechanism for deferring the entry of motions that are required to be entered before

---

[10]  This is now the law of the case.  Nothing in this opinion however should be interpreted as stating that defense counsel's interpretation of R.C.M. 905(b) is correct.

[11]  Nothing in this opinion should be interpreted as passing judgment on a defense counsel who attempted to use the rules for courts-martial to his client's advantage. Rather, we recognize defense counsel have a duty to zealously represent their client – – a far disparate role from that of the military judge.

[12]  We do not suggest that pretrial orders should not provide the parties with adequate time to file motions.

pleas under R.C.M. 905(b).[13]  However, "the military judge for good cause shown may grant relief from the waiver" effectuated by a failure to enter these motions prior to pleas.  R.C.M. 905(e).  The establishment of an alternate deadline under a military judge's authority pursuant to R.C.M. 801, certainly would constitute good-cause.

Furthermore, as an accused may withdraw or change a plea until findings are announced, there seems little to be gained by the current practice of deferring pleas themselves.  That is, an accused who enters a plea at arraignment instead of "deferring" the plea would not be in any worse position.  Adopting this practice would reinforce the military judge's authority, preclude motions by ambush or the alternative of granting a continuance and ordering formal briefing on the eve of trial to deal with counsel zealously representing their client and at the same time hijacking the system.

*B.  Whether the Military Judge Erred in Allowing the Admission of SPC AM's In-Court Identification of Appellant*

On appeal, appellant asserts that the military judge abused his discretion by admitting SPC AM's in-court identification of appellant.  Appellant asserts that the military judge relied on an incomplete, and therefore erroneous, view of the law.  Appellant also asserts that the military judge relied upon SPC AM's certainty in identifying her perpetrator, while ignoring clear evidence refuting her testimony.  We conclude that the military judge did not abuse his discretion in denying appellant's motion to suppress the in-court identification of appellant.

*1.  Forfeiture and Waiver*

Appellant's objection to the in-court identification preserved the issue on appeal.  Therefore, we will reverse should we find prejudicial error.

However, we separately address whether appellant has preserved any objection to the *manner* in which the suppression hearing was conducted.  Here, the military judge deferred ruling on the suppression motion until the government rested its case in chief.  There was not a separate evidentiary hearing.  Instead, the parties litigated the suppression motion by examining and cross-examining the government's witnesses.  As a result, evidentiary objections were sometimes

---

[13]  Rule for Court-Martial 905(d) only allows deferral of a "determination" on a "motion made before pleas are entered," it says nothing about deferral of the filing of the motion itself.

resolved in a bifurcated manner with the military judge agreeing to consider the evidence for purposes of the motion, but not on the issue of guilt.

Neither appellant nor the government objected to the military judge deferring the ruling on the suppression motion. Therefore, appellant has not preserved an objection to the military judge's decision to defer ruling on the motion. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (quoting *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009)). First, appellant raised the suppression motion for the first time at the start of trial. Second, appellant did not specifically request a continuance for the military judge to consider the suppression motion before trial. Third, appellant did not object to the procedure the military judge proposed, that was, to defer ruling on the motion until hearing the government's evidence on the merits. To the contrary, after the military judge explained that he was going to defer ruling until he heard the evidence in the case, defense counsel replied "Yes, Your Honor." As a result, appellant has waived any procedural challenge to the military judge considering evidence on the suppression motion at the same time he was considering evidence on the merits.

Even if we were to find that appellant had only forfeited the issue, we find no plain error. The military judge's decision to defer ruling on the suppression motion until after the government presented evidence on the merits was prompted by the timing of the motion and the defense counsel's agreement for the military judge to defer his ruling.

The *Manual for Courts-Martial* gives the military judge the responsibility and deference to ensure that the court-martial procedures are conducted in a fair and orderly manner. *See* R.C.M. 102; S*ee also* R.C.M. 801(a)(3) discussion (the military judge is empowered to set the time for each session of a court-martial and "prescribe the manner and the order in which proceedings may take place").

Although R.C.M. 905 normally requires motions to suppress be raised prior to entry of pleas, the rule also allows the military judge, for good cause, to defer a determination until trial "or even after findings." R.C.M. 905(d). The military judge "may determine when and in what order motions may be litigated." R.C.M. 801(a)(3) discussion. The military judge also decides the order in which witnesses may testify. *Id*. The military judge decides the order in which parties may argue on a motion or objection. *Id*. Military judges also control the mode and order of examining witnesses and presenting evidence. *Id*. In short, the rules allow the military judge to keep order in the courtroom. In this case, the military judge's procedure to consider the motion was fair, orderly, and did not deny appellant a full opportunity to present evidence on the merits.

Further, in military judge alone trials, "[m]ilitary judges are presumed to know the law and to follow it absent clear evidence to the contrary." *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007) (citing *United States v. Mason*, 45 M.J. 483, 484 (C.A.A.F. 1997)). It is clear from the record that the military judge was considering evidence separately for each purpose. He indicated a number of times to the parties for what purpose he was ruling on an objection or considering the evidence.

### 2. *Review of the Military Judge's Ruling on In-Court Identification*

This court reviews a military judge's ruling on a motion to suppress for an abuse of discretion, viewing the evidence in the light most favorable to the prevailing party. *United States v. Hoffmann*, 75 M.J. 120, 124 (C.A.A.F. 2016). Findings of fact are reviewed under a clearly-erroneous standard and conclusions of law are reviewed de novo. *Id*. The abuse of discretion standard calls "for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010)).

We employ a two-prong test for determining the admissibility of eyewitness identifications. *United States v. Rhodes*, 42 M.J. 287, 290 (C.A.A.F. 1995). First, the court must determine whether a pretrial identification was unnecessarily suggestive. *Id*. If the answer to this threshold question is in the affirmative, the court must next determine whether this "unnecessarily suggestive" pretrial identification was "conducive to a substantial likelihood of misidentification." *Id*. (citing *Manson v. Brathwaite*, 432 U.S. 98 (1977)). "An 'unnecessarily suggestive' pretrial identification does not preclude a reliable in-court identification." *Id*.

The reliability of an in-court identification is evaluated under a totality of the circumstances. *See Rhodes*, 42 M.J. at 291 (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)). Factors to consider in this analysis include the following: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the perpetrator; (4) the witness' demonstrated level of certainty during the confrontation; and (5) the elapsed time between the criminal act and the confrontation. *Id*. These factors, however, are not exhaustive and may also include "the likelihood of other individuals in the area at the time of the offense matching the description given by the victim." *Id*.

The military judge made detailed findings of fact and conclusions of law on the record. His findings of fact were not clearly-erroneous and we adopt the military judge's findings of fact with two modifications. First, the military judge found that "more than 50 people" and "as many as 100 people" attended the party and were predominately African-American. Based on the testimony about how crowded the

rooms at the party were and after reviewing photos of the rooms admitted at trial, we conclude, using our Article 66(c) fact-finding authority, that at least 100 and as many as 200 people attended the party and were predominately African-American. While we do not find the military judge's finding of 50-100 people to be clearly erroneous, we do decide that fact differently. Second, as further described below, the military judge found SPC AM had two opportunities to view appellant's face clearly, whereas we find SPC AM had three opportunities to observe appellant's face clearly.

*a.  Was the pretrial identification unnecessarily suggestive?*

Generally, presenting a victim a single suspect in person or as in this case a single photograph of a suspect are by their very nature suggestive. *Id.* at 290. "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Biggers*, 409 U.S. at 198. "[S]howing a suspect singly to a victim is pregnant with prejudice." *Biggers v. Tennessee*, 390 U.S. 404, 407 (1968) (Douglas, J., dissenting).

The military judge found that SPC Al-Shamesi showed the CID agent appellant's photograph from SPC Al-Shamesi's phone.[14] The CID agent then showed the single photograph to SPC AM who immediately identified appellant as the person who assaulted her at the dance party. Prior to showing SPC AM the photograph, the CID agent did not arrange a photo array or present SPC AM any other options but to say that the photograph was or was not the person who assaulted her. This court also notes that the government did not present evidence or any exigent circumstances to explain the CID agent's decision that it was necessary to show SPC AM the single photograph. The military judge concluded that the identification method used by the CID agent was unnecessarily suggestive. This issue is unchallenged on appeal and we agree with the military judge's conclusion that the pretrial identification was unnecessarily suggestive.

---

[14] Even without the CID agent showing SPC AM appellant's Facebook profile picture before trial, SPC AM would have seen the photograph absent any error in law enforcement procedures. While SPC AM was waiting to be interviewed by CID, her father sent her the picture of appellant to her phone. She opened up the picture but "didn't even take a glance at it" since she was waiting for the interview. However, after CID showed her the picture of appellant from Al-Shamesi's phone, she looked at the picture her father sent and confirmed that they were the same photographs.

### b. Reliability of the in-court identification of appellant

After reviewing the evidence we find the military judge did not abuse his discretion and properly interpreted and applied Mil. R. Evid. 321 and the factors articulated by the Supreme Court in *Manson* and *Biggers* in allowing the in-court identification. The military judge did not specifically state whether the pretrial identification was "conducive to a substantial likelihood of misidentification." *Rhodes*, 42 M.J. at 290 (C.A.A.F. 1995). However, he clearly articulated the two threshold issues he needed to determine under *Rhodes*. The military judge held the government had proven by clear and convincing evidence that the in-court identification of appellant was not a result of SPC AM's inadmissible identification to CID. In articulating his reasoning, it is clear the military judge determined that the pretrial identification did not create a substantial likelihood of causing misidentification.

The military judge found SPC AM had two opportunities to see appellant's face clearly. The first was when she was approximately 20 feet from the light of the DJ stand. At the time of the assault, appellant was only centimeters from SPC AM.[15] The second time, SPC AM was able to observe appellant even more clearly when he approached her near the bathroom with light coming from the entrance area to the party. This court finds there was a third opportunity to see appellant's face clearly,[16] when appellant was pulling her towards a closet at the front entrance area to the party. SPC AM was able to see that appellant was whispering to the three other men by the closet door, before he backed her up against the wall and forced another kiss.

The military judge also found that SPC AM's testimony showed she was extremely attentive to her assailant's features. This court similarly notes that SPC AM—a trained Army Image Analyst—was very detailed in her testimony and identification of appellant.

---

[15] Specialist AM described that appellant's chest was almost touching hers. Appellant grabbed her face, pulled her face towards his face, and he forced a kiss.

[16] The military judge in his findings of fact also found that after the encounter at the DJ stand, SPC AM's assailant grabbed her by the wrist and pulled her toward a closet and forced her to kiss him again. Since the closet was located in a different area of the dance party near the lighting at the front entrance instead of the lighting near the DJ area, this court concludes the encounter at the closet was a third opportunity for SPC AM to observe her assailants face instead of a continuation of the first.

Specialist AM was accurate in her prior description of appellant. This description led SPC Al-Shamesi to instantly realize he had also seen SPC AM's assailant talking with SPC Al-Shamesi's friends at the party.

The military judge found SPC AM's CID identification and in-court identification of appellant were both made immediately and with certainty.[17]

The time between the assaults and the CID identification of appellant's photograph was less than 24 hours. This left little opportunity for SPC AM to forget what she remembered about her assailant and therefore be persuaded by seeing only a single picture.

The military judge did not limit his ruling to considering only the five *Biggers* factors. The military judge considered that many of the African-American males were similar to appellant in age and height. He also considered environmental factors and all the surrounding facts and circumstances of SPC AM's description, including the defense cross-examination of SPC AM regarding the group photograph and the clothing worn by appellant in that photograph. Appellant's defense counsel contended that appellant was wearing a cap instead of a bandana and a shirt with a logo design on the front, instead of a solid dark colored shirt. Ultimately, the military judge concluded appellant was wearing dark clothes, a black and white bandana laying on his head, and a grill piece.

We hold that the military judge did not abuse his discretion in denying the defense motion to suppress and allowing the in-court identification of appellant.

*C. Ineffective Assistance of Counsel*

Appellant asserts that he was denied his right to effective assistance of counsel because his defense counsel failed to request production of the photograph SPC Al-Shamesi provided to CID that was shown to SPC AM. Appellant argues that without the photograph, the defense counsel could not adequately prepare a defense for trial.

We review claims that an appellant did not receive effective assistance of counsel de novo. *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015); *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012). "In order to prevail on a claim

---

[17] The court notes that at the time SPC AM was shown the photograph, there was no statement from the CID agent that law enforcement suspected the person in the photograph of any offense or that the photograph was the result of a prior police investigation of the sexual assault. Specialist AM was shown the photograph the same day she was making the initial complaint to CID.

of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F. 2010) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

Under the first *Strickland* prong, appellant must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 687. The relevant issue is whether counsel's conduct failed to meet an objective standard of reasonableness or whether it was outside the "wide range of professionally competent assistance." *Id.* at 690.

When assessing *Strickland*'s second prong for prejudice, we require a showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. That requires a "substantial," not just "conceivable," likelihood of a different result. *Harrington v. Richter*, 562 U.S. 86, 112, (2011).

Pursuant to *United States v. Ginn*, 47 M.J. 236 (C.A.A.F. 1997), we have analyzed whether a post-trial evidentiary hearing is required. After applying the *Ginn* principles, we find such a hearing is not required in this case. *Id.* at 248. Considering the third *Ginn* factor, appellant's affidavit is factually adequate, and the government's affidavits do not contest the fact that appellant's defense counsel did not request production of the photograph. Any factual disputes about the pretrial discovery of the photograph are not relevant in deciding the legal issue of ineffective assistance of counsel on appeal.

In his affidavit, appellant's defense counsel stated it was a tactical decision not to request discovery of the image shown to SPC AM during her interview by CID. Appellant's counsel did not want to trigger reciprocal discovery and have to provide the government with the aforementioned photograph from the party that showed appellant was wearing clothes that did not match the description of SPC AM's assailant. Namely, appellant was wearing a beanie cap instead of a bandana, and was wearing a blue sweatshirt with "bold, bright" graphics on the front. The defense strategy was to undermine through cross-examination SPC AM's testimony and they did not want the government to have these exhibits before trial to better prepare SPC AM for cross-examination.

At trial, the defense counsel did cross-examine SPC AM about the differences between her description of appellant's clothing and the photograph. They also admitted the shirt he was wearing as evidence. Furthermore, through the documents already provided by the government, appellant's defense counsel knew the government was not in possession of the picture of appellant that was on SPC Al-Shamesi's cell phone. The CID agent returned the cell phone to SPC Al-Shamesi and did not retain a copy of the image. Further, the SA instructed SPC Al-Shamesi

15

to cease all investigative efforts. The defense was aware that the CID agent did not retain a copy of the image he showed to SPC AM. In their affidavits defense counsel recount that the government informed them that "the defense already had everything the government had related to the pre-trial investigation. The [g]overnment indicated it did not intend to introduce the photograph at trial." According to defense counsel, a discovery request for the photograph would have produced nothing, while simultaneously triggering reciprocal discovery

Appellant defense counsel's explanation about concern for reciprocal discovery leaves out the fact that SPC AM and the government were aware of the group photograph prior to trial. Defense counsel previously used appellant's group photograph from the party to cross-examine SPC AM and submit it as an exhibit at the preliminary hearing. On the other hand, reciprocal discovery of the photograph and shirt would have highlighted that the defense intended to again use the photograph at trial and disclose that they intended to use appellant's shirt at trial. See R.C.M. 701(b)(3). Arguably, having pretrial access to appellant's original photograph and shirt from that evening may have better prepared the government and SPC AM for trial.

From a review of the record and defense counsel's affidavit, it appears the decision not to request appellant's Facebook profile photograph was tactical and intentional. Reciprocal discovery would have likely tipped off the government to the suppression motion. Obtaining the Facebook photograph prior to trial would have undermined the defense counsel's argument that the government failed in their discovery obligations to produce the photograph or that the pretrial identification issue was identified on the eve of trial.

Ultimately, since we find no prejudice, we do not have to make a determination if defense counsel was deficient for failing to file a discovery request for the photograph SPC Al-Shamesi found on appellant's Facebook account. *United State*s *v. Captain*, 75 M.J. 99, 103 (C.A.A.F 2016) (citing *Strickland*, 466 U.S. at 697; *Datavs*, 71 M.J. at 424-25).

We find no prejudice to appellant. Appellant has not met his burden in establishing his Facebook profile photograph was exculpatory or would have changed the outcome of the trial. The photograph of the appellant was not a material piece of evidence for the government or defense. Neither party used or intended to use the photograph at trial. The photograph and pretrial identification using the photograph was suppressed by the military judge. The photograph itself did not lead to identifying appellant's name or his interview with CID. Instead, witnesses from the dance party who were mutual friends of appellant and SPC Al-Shamesi led to finding appellant's Facebook photograph. The photograph was from appellant's own Facebook account. Therefore, if the photograph was needed for any purpose, appellant and his defense counsel could access the photograph through

appellant's own Facebook account. Accordingly, the appellant has failed to meet his burden that his trial defense counsel was ineffective.

## CONCLUSION

The findings of guilty and the sentence are correct in law and fact and are AFFIRMED.

Senior Judge MULLIGAN concurs.

WOLFE, Judge, dissenting:

I respectfully dissent.

Under Article 66(c), UCMJ, my duty is to determine whether the findings are correct in law, correct in fact, and whether the findings should be approved. This case presents concerns on all three fronts. In the end, I conclude the military judge prejudicially erred in not suppressing SPC AM's in-court identification of appellant.

I also consider the factual sufficiency of the evidence to be a close call. Close enough that in my weighing, the evidence is factually insufficient without SPC AM's in-court identification. That is, had the in-court identification not been introduced, I would find insufficient facts to support appellant's conviction.

There is, of course, a substantial difference between finding reversible legal error and finding the evidence factually insufficient. A rehearing may be authorized for the former but not the latter. *See* Article 66(d), UCMJ. Thus, whether a Court of Criminal Appeals conducts a factual sufficiency review *before* or *after* reviewing for legal error can be critical.

I conclude that a factual sufficiency review is conducted based on the case *as it was tried.* That is, I should look to see whether the evidence is legally and factually sufficient *before* I consider whether there was other prejudicial legal error. Accordingly, while I would set aside the findings in this case I believe a rehearing is authorized.

*A. The Suppression Motion*

Military Rule of Evidence 321 governs eyewitness identifications. Under Mil. R. Evid. 321(c)(1) an "identification process is unreliable, and therefore unlawful, if the . . . identification process is so suggestive as to create a substantial likelihood of misidentification."

That the photo lineup was unlawful and should have been suppressed is unchallenged on appeal. That is, the military judge correctly prohibited SPC AM from testifying that she identified appellant in the photo lineup. At issue is whether the military judge properly allowed SPC AM's *in-court* identification of appellant as her assailant.

Under Mil. R. Evid. 321(d), the subsequent in-court identification is allowable only if the government can show "by clear and convincing evidence" that it is not the result of the inadmissible identification. I have several concerns with the military judge's analysis.

First, with one exception, all the evidence regarding SPC AM's various descriptions of her attacker appear to post-date the improper photo lineup. That is, these descriptions share the same infirmity as the in-court identifications—they were tainted by the overly suggestive photo lineup.[18] Thus, I disagree with the military judge that SPC AM "gave a very detailed description of her assailant." Yes, her in-court description was detailed and apparently matched appellant. However, I don't think it proper to use the detail contained in the possibly tainted in-court testimony to determine whether that same testimony was tainted. In *Manson v. Brathwaite*, by contrast, the witness's detailed description of the suspect was made *before* he saw the one-photo line-up. 432 U.S. at 101.

While there is some evidence in the record that SPC AM described her assailant to CID before being shown the suggestive photograph this was never adequately explained or explored by the government. The burden was on the government to prove this fact.

The one "pre-taint" description of SPC AM's assailant was extraordinarily not detailed. This was SPC AM's initial description of her attacker to SPC Al-Shamesi. Specialist Al-Shamesi testified SPC AM told him that her attacker wore a black bandana lying flat on his forehead. However, before SPC AM could further describe her attacker, SPC Al-Shamesi testified that he stopped her from any further description.

---

[18] At trial, the defense tried to undermine SPC AM's in-court identification of appellant by asking if SPC AM was "aware that [appellant] has gained 30 pounds since [the offense date]." She responded that she was not aware. On appeal, appellant asserts this as additional evidence of misidentification. While I agree with appellant's brief in many respects, I disagree here. The defense counsel's question was not evidence that appellant had, in fact, gained 30 pounds.

> I stopped her there and I said, 'I probably know who this is,' because I reminisced, in the club when I ran into [two friends], they introduced me to this male who put a black and white bandana over his head. . . .

In other words, in the one description of her assailant that was untainted, SPC AM was cut off before she could finish her description. All we are left with is that the assailant wore a bandana lying flat on his head. Using this brief description, SPC Al-Shamesi identified appellant as the assailant by contacting his friends and doing brief research. This then lead to SPC AM being shown a single photo of appellant by a CID agent. All of SPC AM's subsequent descriptions of her attacker risk being tainted by the unlawful photo lineup.[19]

Second, I find insufficient support in the record for the military judge's conclusion that upon being shown the photo of appellant "[SPC AM]'s reaction, when seeing the picture, was immediate and certain." She testified on direct as follows:

> Q. And you were able to identify the person who assaulted you as the guy in the phone photograph?
>
> A. Yes, sir.

She was asked again on redirect and testified:

> Q. And [the CID agent] said, "Can you identify this person?
>
> A. Yes, sir.
>
> Q. And were you able to?
>
> A. Yes.

---

[19] For example, compare this case to the lineup conducted by the Washington, D.C. Metropolitan Police as described in *Heath v. United States*, 26 A.3d 266, 270 (D.C. 2011). There, the witness was shown "an array of nine photographs of African–American men of approximately the same age and complexion, all with their hair in dreadlocks." *Id*. The witness was also read instructions that emphasized that a picture of assailant was not necessarily included in the photo array. *Id*. at 270 n.3.

Q. And who was that person? Was it the same person from the night prior?

A. Yes, sir.

The CID agent who showed the photo to SPC AM said she identified appellant instantaneously and testified as follows:

Q. [. . .] Approximately how long would you say that it took for her to make a response after you showed her the photo?

A. Mere seconds, sir. I mean, it was--she didn't look at it and take her time. It was quite fast.

Q. And did she say anything else about it?

A. No, not just other than that she identified that person from the incident that occurred earlier.

SPC AM's description of her identification of appellant consisted of one-word answers to leading questions. While the CID agent testified to the speed of her identification, he did not testify about her degree of confidence. By contrast, in *Manson v. Brathwaite,* the witness testified that "There is no question whatsoever" that he had identified the proper person. 432 U.S. at 115. This positive assurance was repeated. *Id.*

Third, I do not believe SPC AM had an excellent opportunity to view her assailant. The military judge found that SPC AM had ample time and opportunity to view the person who had assaulted her. The military judge credited SPC AM's testimony that she could identify appellant by the light of a DJ booth in an otherwise dark, crowded and noisy room. The military judge's findings have support in the record and are not erroneous. However, as a judge on a court that reviews questions of fact de novo, I am not as confident that the conditions surrounding the assault provided a good opportunity to observe SPC AM's attacker.

Fourth, the government did not introduce the photo that was used to create the unlawfully suggestive lineup.[20] That is, I cannot find the government to have met its

---

[20] Appellant asserts his counsel was ineffective for not seeking production of the photo. As it was the government's burden to establish that the in-court identification "was not the result" of the unlawful single-photo lineup, I do not see

(continued . . .)

burden of proving by clear and convincing evidence that SPC AM's in-court testimony was untainted by the single photo line-up when the government did not introduce the photo itself. How suggestive was the photo? A key question in this case is whether, *after* being shown the photo of appellant, SPC AM was describing her attacker or was she describing the photo of appellant. Without the photo, this is a hard question to answer.[21]

-------

(. . . continued)
the defense counsel's performance as deficient. I therefore would not grant appellant relief for ineffective assistance of counsel; albeit for reasons other than the majority.

[21] I share the majority's concern regarding the manner in which the suppression motion was raised. The record supports the majority's conclusion that the defense intentionally raised an oral motion to suppress on the morning of trial for purposes of tactical advantage. Appellant asserted, citing R.C.M. 905, that he had the right to make a suppression motion as a matter of right because he had not, yet, entered pleas.

To the extent that the majority opinion stands for the proposition that military judges have the authority to reasonably control motions practice, the discretion not to consider untimely motions, control of their dockets to ensure an orderly system of justice, and may require an entry of a plea when required by the rules, I fully join that part of the opinion.

Here, R.C.M. 905(b) was argued, incorrectly in my view, to have the opposite of its intended effect. Instead of requiring that a motion to suppress be resolved early in the trial process, appellant used the rule to raise a suppression motion at the last possible minute before the trial began. There are obvious possible tactical benefits to surprising the government with a case dispositive, complex, and non-frivolous motion just before opening statements. *For example, the government may be unprepared to introduce the key photo necessary to win the motion.*

Admittedly, appellant's strategy likely backfired when the military judge held the suppression motion simultaneously with trial on the merits. Having locked in his forum selection, the defense discovered halfway through the trial that the military judge found SPC AM to be credible and by "clear and convincing evidence" found the defense's theory of mistaken identity to (at least partially) not hold water. This left the defense with little ability to adjust their case by presenting a theory that was not contingent on winning the suppression motion.

(continued . . .)

Under *Washington* I am "admoni[shed]" to "recognize that the trial court saw and heard the witnesses." I am well aware that much is lost when live testimony is transcribed into emotionless text. For me, this "recognition" is greatest when judging credibility. The tone and tenor of an answer can invert its meaning.

Here, however, the central issue is not the credibility of SPC AM's testimony. She is a credible witness. My concern here is the *accuracy* of SPC AM's testimony, not her honesty. The danger of an overly suggestive lineup is that it will influence the memory of the witness. That is, the danger is that the witness will honestly, *but incorrectly*, identify the accused because of the unlawful line up. Indeed, a sincere but mistaken witness may be more dangerous to a just result than a dishonest witness. The latter's dishonesty may be more easily revealed in cross-examination. Thus, in cases such as this, I give less recognition to the trial court's ability to see and hear the witnesses when conducting an Article 66(c), UCMJ, review.

Accordingly, I conclude that the military judge erred when he found clear and convincing evidence that SPC AM's in court identification was not the result of the inadmissible identification. As SPC AM's testimony was the only direct evidence that appellant was the assailant, I find the error to be prejudicial. *See* UCMJ art. 59(a).

## B. Should a rehearing be authorized?[22]

Notwithstanding that I find the military judge erred, I believe a rehearing is authorized in this case. This is because I believe that I should conduct a legal and factual sufficiency review of the evidence *before* we address other claims of legal error. In other words, while I believe the military judge erred in not suppressing

---

(. . . continued)
However, and again, neither side objected. The government did not ask the military judge to deny appellant relief because the motion was untimely. *See* Mil. R. Evid. 321(d)(2). The government did not ask the military judge to direct a written motion be filed in compliance with court rules and the pretrial order. And, finally, neither party asked the military judge for a continuance so that they could properly have a hearing on the surprise suppression motion. Given this forfeiture by the government, I see my duty as to strictly apply Mil. R. Evid. 321 without considering any infirmity in the government's evidence that might be attributable to surprise.

[22] I discuss this issue at length to explain why I find the case to be factually sufficient, notwithstanding that I would suppress the government's strongest evidence, and that without that evidence the case falls apart.

SPC AM's in-court identification of appellant, I believe that we *do* consider this evidence when weighing whether the evidence was factually and legally sufficient.

The order in which we conduct our analysis is critical. Under Article 66(d), UCMJ, this court may not authorize a rehearing if we find the evidence factually insufficient. Absent the in-court identification, there would be no direct evidence tying appellant to the offense. Thus, this is a distinction *with* a difference. Although I have not been able to find any military case law on point, I reach this conclusion for two reasons.

First, the alternative would risk violating the Double Jeopardy Clause and Article 66(d), UCMJ. Consider, for example, a case that has *both* factually insufficient evidence and legal error. Were I to address the legal error first, I might authorize a rehearing without ever considering whether the evidence was lacking. In such a case, I would be ordering a rehearing in direct contravention of Article 66(d), UCMJ. If the evidence was *legally* insufficient, I would be authorizing a rehearing in violation of the Double Jeopardy Clause. *Compare Tibbs v. Florida*, 457 U.S. 31 (1982) (holding that the Double Jeopardy Clause of the Fifth Amendment does not apply to reversals based on factual sufficiency) *with* Article 66(d), UCMJ (prohibiting a rehearing when a court of criminal appeals determines the evidence is factually insufficient).

Second, I believe the Supreme Court's decision in *Lockhart v. Nelson*, 488 U.S. 33 (1988) is controlling in determining *when* we evaluate legal sufficiency. I find it persuasive authority for determining when to evaluate factual sufficiency. In that case, the court considered a trial error which, once resolved in appellant's favor, resulted in legally insufficient evidence to support the conviction.

> It appears to us to be beyond dispute that this is a . . . reversal for 'trial error'--the trial court erred in admitting a particular piece of evidence, and without it there was insufficient evidence to support a judgment of conviction.

*Id.* at 40. The Court then proceeded to address whether the Double Jeopardy Clause allows retrial when a reviewing court determines that a defendant's conviction must be reversed because evidence was erroneously admitted against him, and also concludes that without the inadmissible evidence there was insufficient evidence to support a conviction. *Id.*

The Supreme Court concluded that the Double Jeopardy Clause does not foreclose a retrial in this situation because the reviewing court must look to *all* the evidence, not just the legally admitted evidence, to determine whether a retrial is permitted. The Court stated:

> It is quite clear from our opinion in *Burks* that a reviewing court must consider all of the evidence admitted by the trial court in deciding whether retrial is permissible under the Double Jeopardy Clause--indeed, that was *ratio decidendi of Burks, see* 437 U.S. at 16-17 . . . . The basis for the *Burks* exception to the general rule is that a reversal for insufficiency of the evidence should be treated no differently than a trial court's granting a judgment of acquittal at the close of all the evidence. A trial court in passing on such a motion considers all of the evidence it has admitted, and to make the analogy complete it must be this same quantum of evidence which is considered by the reviewing court.

*Id.* at 41-42; *See also United States v. Taylor*, 61 M.J. 157, 162 (C.A.A.F. 2005) (authorizing a rehearing even though the government could not establish all of the elements of the charge against appellant without improperly admitted evidence and citing *Lockhart*).

While the Supreme Court addressed only the legal sufficiency of the evidence (not factual sufficiency) the logic of the opinion applies to both determinations. Accordingly, I conclude that when reviewing for factual sufficiency we judge the evidence based on the evidence as it was admitted, not after carving off any evidence that was improperly admitted or considered.

Accordingly, I would set aside the findings and sentence and authorize a rehearing.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

24